Filed 12/19/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S082915 |
| v. | ) | |
| | ) | |
| SUSAN DIANNE EUBANKS, | ) | |
| | ) | San Diego County |
| Defendant and Appellant. | ) | Super. Ct. No. SCN 069937 |
| _____ | ) | |

On October 26, 1997, defendant Susan Dianne Eubanks shot and killed her four young children. When they died, the children, Brandon, Austin, Brigham, and Matthew, were, respectively, ages 14, seven, six, and four. A jury found defendant guilty of four counts of first degree murder (Pen. Code, § 187).[1] The jury found true as to each murder the special circumstance allegation that defendant had committed multiple murders (§ 190.2, subd. (a)(3)). The jury also found that defendant personally used a firearm (§ 12022.5, former subd. (a)(1), as amended by Stats. 1995, ch. 377, § 9, p. 1950; see new § 12022.5, subd. (a)) in the commission of the murders. After a penalty trial, the jury returned a verdict of death. The trial court denied defendant's motion to modify the penalty verdict (§ 190.4, subd. (e)), and imposed a determinate term of four years for each of the

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

1

gun use enhancements.  This appeal is automatic.  (§ 1239, subd. (b).)  We affirm the judgment.

## I.  FACTS

### A.  Guilt Phase

At the time defendant killed her children, she had been living with them, her boyfriend Rene Dodson, and her nephew in a small home in San Marcos. Defendant and her first husband, John Armstrong, had one son, Brandon. Following her divorce from Armstrong, defendant married Eric Eubanks.[2]  She was pregnant at that time with Austin, the child of Larry Shoebridge, with whom she had been living.  Eric fathered two of defendant's sons, Brigham and Matthew. After defendant's brother died, defendant obtained custody of her nephew.

Each son had been shot in the head by the same five-shot .38-caliber revolver; at the time of their deaths, Austin and Brigham had 0.02 micrograms of Xanax in their blood, while Brandon and Matthew had none.

In the living room, defendant had put the revolver to the temple of 14-year-old Brandon and shot him; she also shot him in the neck from a few inches away. She shot her younger sons in their bedroom.  With the revolver no more than a foot from Austin's head, she shot her seven-year-old son near his left eye.  With the gun inches from Brigham's head, she shot her six-year-old son twice, once above his left ear and once close to his right ear.   With the gun close to the head of four-year-old Matthew, she shot him in the top of the head, leaving stippling marks on his face.  She fired other bullets in the bedroom that hit a wall and a window.  At some point in that bedroom, defendant opened the revolver's

---

[2]    Because defendant and Eric Eubanks share the same last name, we refer to Eric Eubanks by his first name throughout this opinion.

2

cylinder, removed the five expended shell casings, put them in a trash can, and reloaded the five-shot revolver.

Defendant shot herself in the abdomen with that same revolver. Her six-year-old nephew was home at the time of the shootings. He was found unharmed, in bed, with blankets pulled up to his chin.

Deputies who entered the home shortly after the shooting found five notes on defendant's bedroom floor, all in defendant's handwriting. One was to Eric. Defendant wrote, "You betrayed me. You kept a diary, and you and Rene Dodson conspired against me." She added, "I've lost everyone I've ever loved. Now it's time for you to do the same." She said he could use any money from her worker's disability case to "bury the kids and find your rainbow. Anna May, I'm sure." In a note to Dodson, defendant wrote he was "the biggest liar to date that I know. Stay on crystal meth and let your 37-year-old ass move back with Mom and Dad. Get back with Pam and/or Sherri. They're your class." It concluded, "See ya . . . Ha, ha." A third letter was to Brandon's father. It said, "I know you'll hate me forever, but I can't let [Brandon] live without his brothers, so I did what I did." She wrote she had been "strong for 25 years, and I'm tired of all the fight and hurt." She ended the note by complaining that Dodson "fucked me all up." Defendant also wrote to her niece and her sister, apologizing for her actions. To the niece, defendant explained, "I know what I'm doing is going to hurt you tremendously, but I can't and have no desire to go on." To her sister, defendant wrote she was "tired of being strong," that "things are way out of hand." Defendant included Matthew's birth date and hers and asked her sister to ensure that the two of them would be "in the same casket."

Besides the evidence of the crimes themselves and the above described notes, the prosecution presented the following evidence regarding events that preceded the crimes.

3

The Eubanks marriage had appeared stable until defendant experienced job-related injuries that required surgery. She then began to abuse prescription medications and alcohol, she lost her job, and she and her husband Eric began a recurring pattern of separation and reconciliation. The police found more than 50 bottles of prescription medications in defendant's house after the murders.

In the fall of 1997,[3] the Eubankses were going through a divorce, and Eric moved out of their South Twin Oaks home about one month before the murders. Defendant and Rene Dodson had had an intimate relationship on and off since they met in 1994. Dodson moved into defendant's house after Eric moved out. From October 13 to 19, Dodson left defendant's house, and Eric moved back in. A short time later, Eric moved out, and Dodson returned.

About 10 days before the murders, defendant purchased replacement dead bolt locks for her house. Appearing angry, she told a clerk who knew Dodson that he had broken the lock on her door, and she was buying new ones so he could not enter or get "his F'ing stuff." Defendant told the clerk to warn Dodson that she just purchased bullets at a nearby store and one "had his name on it." Defendant then asked one of the little boys with her, "Mommy did buy the bullets, didn't she, didn't she?" Dodson testified defendant previously had commented that, if pushed, she would kill her children and herself.

The afternoon of October 26, the day of the murders, Brandon stayed home to watch his siblings and defendant's nephew while defendant and Dodson went to a bar to watch football. The couple ordered a pitcher of beer and soon were joined by another couple. Defendant did not want the woman to sit with them due to a confrontation they had had when she had criticized defendant for talking about

---

[3]     All calendar references are to 1997 unless otherwise noted.

4

Dodson behind his back. Dodson decided he and defendant should go to a different bar because defendant was upset.

Defendant argued with Dodson when they left, complaining he had taken the other woman's side. She slapped Dodson a few times while he was driving; Dodson then decided to drive home. When defendant realized they were not going to another bar, she slammed the minivan into its parking gear while they were travelling 30 miles per hour on a freeway off-ramp. Defendant removed the keys from the ignition, but Dodson eventually was able to retrieve them and drive home.

Once home, the couple continued to argue in their bedroom. When Dodson said he wanted to leave and move to Hawaii, defendant slapped him, took his keys, blocked his exit from the room, and ripped out the telephones. Eventually, they calmed down and had sex. Dodson then said he was going to watch television in the living room; instead, when defendant was in another part of the house, Dodson ran to a nearby gas station, called the Sheriff's department, and asked that they send a deputy to stand by so he could retrieve his belongings and truck from defendant's house.

While defendant and Dodson were fighting, Brandon had gone to a pay telephone and called Kathy Goobs (Kathy), the mother of his best friend. He asked her to come get him and the other boys because his brothers were scared and Brandon did not want them exposed to the fighting. Kathy told Brandon to go home, reassess the situation, and to call again if he still needed her to pick them up.

A short time later, defendant called Kathy, "pleading" for Kathy to come take the boys. Kathy testified that she spoke to defendant, who, though upset and agitated, did not sound intoxicated. Defendant said she feared Dodson would call the police and that, if they came, they would take and separate the children. Kathy

5

agreed to pick up the boys but never left to get them. Kathy had been allowing Eric to stay at her home until he found a place to live; she decided not to get the boys because she was concerned defendant no longer would allow Brandon to visit her son if defendant saw Eric at Kathy's house when defendant came to retrieve the boys because she would think Kathy was "taking sides."

Deputy Sheriff Daniel Deese picked up Dodson at the gas station. As they approached defendant's house, defendant was carrying Dodson's tools away from his vehicle, which had two flat tires and broken headlights. When Deese told defendant to drop the tools, she became confrontational and claimed Dodson owed her money and had raped her. She went inside after Deese threatened to arrest her. While Dodson was putting his tools in the patrol car, defendant came outside, yelling, "I've been screwed by men my whole life. I've been beaten. I've been raped."

As Dodson left with Deese, they saw Eric parked nearby. Kathy had paged Eric and advised him of the calls from defendant and Brandon, and Eric had come to check on the children. He saw the police car and was waiting for it to drive away because defendant had a restraining order against him. After learning that defendant was throwing Dodson out, Eric agreed to take Dodson to a bar in Escondido. They loaded the tools into Eric's truck and left.

Back inside her house, defendant telephoned Brandon's grandfather and then called Armstrong in Texas. She told Armstrong the police had been there investigating the incident with her boyfriend in which she had slashed his tires, broken his windshields, and put sugar in his gas tank, and that she feared child protective services would come to take the children. She said she needed Armstrong to tell Brandon to "stick by me on this one, even if it means lying."

When Eric arrived at Kathy's home after 6:00 p.m., he had her listen to a voice mail he just had received in which defendant simply said, "Say goodbye."

6

At 6:30 p.m., Eric called the Sheriff's office and asked to speak with Deputy Deese; about 7:00 p.m., the two connected. When Eric mentioned the message and his concern that defendant had a handgun at the house, Deese instructed him to request a welfare check of defendant's residence.

The defense presented evidence through the testimony of Dr. Clark Smith, who was board certified in addiction and forensic psychiatry, that the fact defendant received infusions of saline and other fluids while in the ambulance would have affected the alcohol content of the blood drawn from her at the hospital. Although that blood sample revealed a 0.07 percent blood-alcohol content and a toxicologist had calculated that defendant's blood-alcohol content at the time of the murders was 0.09 percent, Dr. Smith testified defendant's blood-alcohol content at the time of the murders would have been closer to 0.19 percent. He testified the infusions given to defendant similarly would have affected the level of Valium found in her blood. He opined that the alcohol and drug levels in defendant's blood at the time of the shooting would have produced a "very significant effect" on her brain and would have affected her emotions, perceptions, judgment and other "higher brain functions."

Dr. Vina Spiehler, the toxicologist who had estimated that defendant's blood-alcohol content was 0.09 percent at the time of the murders, was called as a rebuttal expert witness to refute Dr. Clark's conclusions. Dr. Spiehler testified she had based her calculations on formulae published in recognized literature, and that she formed her opinion that liquid intravenous infusions into the body do not affect blood-alcohol or drug concentrations in the manner claimed by Dr. Smith based on literature on dilutions and her personal experience while working at a coroner's office.

### B. Penalty Phase

#### 1. Prosecution Evidence

Crime scene reconstructionist Rod Englert (Englert) testified as an expert that defendant first shot Brandon twice in the living room, next shot Austin once, and then fired twice in the direction of Matthew but missed. Englert testified defendant reloaded her revolver at that point and then shot Brigham twice, fired a shot between Brigham and Matthew, and then shot Matthew once.

Larry Shoebridge testified that an old girlfriend contacted him in 1989 while he and defendant were romantically involved and living together. Defendant responded by putting a gun to Shoebridge's head and saying she " 'could do whatever she wanted' " and she " 'could'a killed' " him. Shoebridge decided to leave. Fearing defendant's reaction to his decision, he moved out after she had gone to work. After defendant discovered where Shoebridge was living, she drove up to his house. Defendant screamed at Shoebridge and tried to attack his female friend. Defendant eventually drove off, screeching her tires.

Brandon's relatives and a friend testified about the impact Brandon's death had on their lives. The paternal grandmother mentioned two incidents in which she believed defendant had abused Brandon. Teachers and coaches testified about the impact the boys' deaths had on them.

Linda Smith, defendant's sister, testified regarding a telephone call she received from defendant in which defendant said she once had rubbed her nephew's face in a dirty diaper after she learned he had hidden the diaper behind his bed. When Smith became angry with her, defendant changed her story and said she only had made her nephew smell the diaper as punishment.

#### 2. Defense Evidence

The defense presented evidence that defendant's mother and stepfather were alcoholics who fought constantly and had affairs. Defendant's mother

8

abused her by slapping her and dragging her by her hair. Defendant's mother died in a house fire when defendant was eight years old. Defendant then was rotated among relatives, including an aunt who abused her and a relative who managed a hotel and had defendant and her siblings clean its rooms. Defendant sometimes lived with her stepfather in a trailer, where he would get drunk and urinate on himself.

The defense presented testimony from relatives and defendant's coworkers that defendant's "number one concern" was her children, that she was proud of them and "very caring," that she was an excellent employee, and that she did well in the courses she took to become a medical office insurance biller after becoming disabled from a job-related back injury. Relatives and friends who testified that defendant was "tortured" during her childhood and that she was a loving parent asked the jury not to impose the death penalty. The children's former pediatrician testified defendant regularly brought her sons to him for check-ups and medical problems.

Eric Eubanks testified about his marriage and family life with defendant. He said he still had some "love feelings" for her.

A correctional consultant testified defendant would not be a "future danger" if sentenced to life without the possibility of parole.

## II. PRETRIAL ISSUES

### A. Pretrial Jury Screening Issues

#### 1. Introduction

The jury commissioner prescreened prospective jurors for eligibility to serve on defendant's case based on whether they met the basic qualifications for

9

jury service set forth in Code of Civil Procedure section 203,[4] whether they were available to sit on a case that could last approximately 10 weeks, and whether they were entitled to be excused based on specific hardship grounds agreed upon during meetings between the trial court and the jury commissioner. Defendant sets forth four challenges to the preliminary jury screening.

Defendant first contends the jury commissioner agreed to a process to prequalify jurors who would be available for a 10-week trial but ignored that plan and "exceeded her official function" by using her "discretion to excuse potential jurors," "effectively excus[ing] anyone who did not wish to serve," and "engag[ing] in the kind of jury selection that is to be conducted by the trial court in the presence of all parties." Defendant claims the commissioner's "wholesale" excusal of prospective jurors resulted in a "skewed jury pool"[5] in violation of her

---

[4] Code of Civil Procedure section 203 sets forth which persons are qualified to be trial jurors in the state of California. It provides that "[a]ll persons are eligible and qualified to be prospective trial jurors" except persons who are not citizens, who are less than 18 years of age, who are not domiciliaries of California or residents of the jurisdiction wherein they are summoned to serve, who have been convicted of malfeasance in office or a felony and their civil rights have not been restored, who are serving as grand or trial jurors in a California court, who are the subject of conservatorship, or, as relevant to the issues raised by defendant, "who are not possessed of sufficient knowledge of the English language, provided that no person shall be deemed incompetent solely because of the loss of sight or hearing in any degree or other disability which impedes the person's ability to communicate or which impairs or interferes with the person's mobility." (Code Civ. Proc., § 203, subd. (a).)

[5] "The jury 'pool' is the master list of eligible jurors compiled for the year or shorter period from which persons will be summoned during the relevant period for possible jury service. A 'venire' is the group of prospective jurors summoned from that list and made available, after excuses and deferrals have been granted, for assignment to a 'panel.' A 'panel' is the group of jurors from that venire assigned to a court and from which a jury will be selected to try a particular case."

*(Footnote continued on next page.)*

10

rights to a jury drawn from a representative cross-section of the community, to have counsel, to be present at critical stages of her trial, to a public trial, and to the heightened reliability in proceedings governing a capital case under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and article I, sections 7 and 15 of the California Constitution.

Second, defendant contends the summons mailed to prospective jurors improperly asked recipients to identify their "native language" and "effectively informed jurors whose primary language was not English, and who may have had some difficulty with the English language, that [they] could excuse themselves from jury service" and, as a result, "many people whose command of English was more than adequate were given the opportunity to avoid jury service." Defendant argues this impropriety "dissuaded Hispanics from appearing" and caused their underrepresentation "in the venire," which violated her right to a jury drawn from a representative cross-section of the community under the Sixth Amendment to the United States Constitution and article I, section 16 of the California Constitution.

Third, defendant contends that permitting "self-excusal for those with imperfect English" also violated her due process and equal protection rights, is unconstitutionally vague, and, in her case, was impermissibly discriminatory because Hispanic citizens "reacted to the factor by not responding at all," thereby creating an "imbalance" between eligible Hispanic voters and those who answered the summons.

_____

*(Footnote continued from previous page.)*

(*People v. Bell* (1989) 49 Cal.3d 502, 520, fn. 3.) We construe defendant's claim as a complaint that the excusal process resulted in a "skewed" jury panel.

Defendant's fourth contention is that the failure of a court reporter to record the trial court's discussions with the jury commissioner or record the hardship screening itself violated her rights to due process and a jury trial "under the Fifth, Sixth, Eighth and Fourteenth Amendments, as well as the applicable statutes."

In response, the People contend defendant forfeited these four issues regarding the preliminary jury screening by failing to object in the trial court to the challenged procedures. For the reasons stated below, we conclude the People's position on forfeiture generally has merit.

### 2. *The Facts Regarding the Challenged Prescreening*

The trial court mailed out 7,000 summonses to prospective jurors for defendant's pending trial. On June 9, 1999, 700 people answered those summonses and appeared before the jury commissioner. During the screening that ensued that day, the commissioner excused 481 individuals from jury duty. The trial court determined that it needed a larger panel and instructed the commissioner to qualify more prospective jurors from regular panels that would be assembled at the courthouse on Mondays and Tuesdays until July 21, 1999.[6] On that date, 29 individuals who had previously been qualified as prospective jurors on June 9 failed to return to the jury facility. The remaining jury panel was sworn in, and those jurors filled out questionnaires. On July 27, 1999, the trial court commenced voir dire of the jury panel.

The defense was aware San Diego County utilizes jury commissioners to conduct prescreening of potential jurors for death penalty cases. In October 1998, defendant made a motion for a "fair and impartial trial" in which she asked the trial court to provide "guidance" by advising the jury commissioner to exclude (1)

---

[6] Apparently, no records were maintained regarding these additional proceedings "other than the summons and attachments."

individuals who either "request service on a death penalty case" or seek to "avoid service on a death penalty case," and (2) potential jurors who had been excused from another case during jury selection or had recently served on another trial. In December 1998, defense counsel explained to the trial court that, as to the categories of jurors included in its motion to ensure a fair and impartial trial, it was requesting that "rather than go through the voir dire process and weed those jurors out, to just deal with them up front and exclude them from the panel" during the preliminary screening that would be implemented by the jury commissioner on June 9, 1999. Defendant did not object to the fact that the jury commissioner would make initial decisions regarding exclusion of potential jurors; instead, she sought to use that procedure for her own benefit. During the hearing on her motion, defendant neither asked to be present during the jury commissioner's preliminary screening, nor for those proceedings or any conversations between the trial court and the jury commissioner to be recorded.

On December 14, 1998, the prosecutor asked the trial court to deny the motion because "Code of Civil Procedure section 203 sets forth those people [who] are ineligible to sit as jurors . . . and the request by the defense is not covered by that section." In denying the motion, the trial court agreed that the exclusions sought by defendant were not covered by the cited "rules of procedure." The trial court then explained that it would instruct the jury commissioner not to provide prospective jurors with information regarding "what case" they would be "sitting on" or whether the case was "civil or criminal." It was apparent from the court's ruling that the jury prescreening procedure, including the summons notices and the jury commissioner's prescreening, would eliminate individuals who fit within the exceptions to juror eligibility set forth in section 203 of the Code of Civil Procedure, including the exception for those "who are not possessed of sufficient knowledge of the English language." (Code Civ.

13

Proc., § 203, subd. (a)(6).) Nevertheless, at no time during this hearing or thereafter did defendant object in the trial court to any language in the summonses sent to prospective jurors, including the sentence "My native language is _____," which was to be filled out if the person summoned had checked the box indicating he or she was not qualified to serve as a juror because "I DO NOT HAVE SUFFICIENT KNOWLEDGE OF THE ENGLISH LANGUAGE to act as a juror." Similarly, defendant did not object to the role of the jury commissioner in eliminating those not eligible for jury service under Code of Civil Procedure section 203. Furthermore, at the hearing on the motion, defendant did not request that the jury commissioner's prescreening with prospective jurors or the commissioner's conversations with the trial court be recorded.

On February 9, 1999, in the course of discussing the proposed jury questionnaire, the trial court noted that it would need to send out juror "notices . . . in the thousands to get enough folks to appear for the jury duty" and that those notices would need to include an "estimate of time" that the trial would take.[7] On March 1, during a hearing on defendant's motion for a continuance, the trial court commented that it would be "summoning 7,000 jurors" in anticipation of defendant's case. Later that day, while discussing the mechanics of jury selection, the trial court said it was "hoping to have at least 500 fill out the questionnaire." On May 6, the court indicated that the 7,000 summonses had been sent in April and that it was anticipating eventually working with 500 questionnaires. Over the months during which jury screening and selection was discussed, defendant never questioned why only 500 prospective jurors would be filling out questionnaires if 7,000 had been sent summonses.

---

[7] All calendar references regarding the jury screening are to 1999 unless otherwise noted.

On May 26, the trial court mentioned it was conducting meetings with the jury commissioner regarding the jury screening in defendant's case. Defendant raised no objection at that time; she did not request that those meetings be recorded or that she should attend them. Thereafter, the trial court explained that the jury commissioner would screen prospective jurors regarding whether they were able to serve on a lengthy trial based on the following criteria: "financial hardship," "prepaid vacation; medical appointments that cannot be changed, or full-time school enrollment." Defendant did not request more detailed information regarding the proposed "time qualification" or hardship process, although the trial court offered to show counsel such information "if you're interested at all." Similarly, at no point did defendant object to the portion of the summons notices sent to potential prospective jurors that included a "REQUEST FOR EXCUSE SECTION" that listed claimed hardships.

At that same May 26 hearing, defendant, through counsel, did insist that she wanted to be present when the information was read to the prospective jurors and when those prospective jurors would be told that they would need to fill out a lengthy questionnaire. At that time, defendant did not ask to be present at any of the other prescreening procedures, including those that involved the jury commissioner's preliminary screening of potential jurors.

Defendant had surgery on May 29, and was not present at the next hearing on June 2. The trial court suggested continuing the trial to July to give defendant time to recuperate. The court then suggested a complicated plan to preserve some of the prospective jurors from the summonses sent in April and to pick up additional prospective jurors "on Mondays and Tuesdays when they have their normal jury pool." The court explained that its plan would allow the jury commissioner to start qualifying people for the July trial date and would save the expense of sending out new summons notices.

15

The trial court then commented that "the beauty" of its proposal was that "by the end of Wednesday," there would be "a nice random list of time qualified jurors." Based on his misunderstanding of the proposal, William Rafael, one of defendant's attorneys, interjected, "I know the court noted the beauty of it. The ugly of it is that our client won't be present. That's a problem in a capital case." The following exchange ensued: "THE COURT: [¶] Present for what? [¶] MR. RAFAEL: For the time qualifying of the jury. Last week the court spoke when we talked about coming in on the 9th, and the conversation dealt with having our client, Mr. Garcia [defendant's other attorney], and Ms. Regan [the prosecutor] present in the jury assembly room- - [¶] THE COURT: Right. [¶] MR. RAFAEL: - - *so that introductions can be made.*" (Italics added.)

The trial court then clarified that the previously requested introductions were scheduled to occur "before we do the questionnaire, though. So, see, [defendant] would be present. It would be exactly like we were going to do it." Acknowledging his prior confusion, Rafael withdrew his objection to defendant's absence: "MR. RAFAEL: So we're just going to do the time qualifying next week? [¶] THE COURT: . . . What we were going to do next week is they time qualify. . . . Then we would have all come down, introduced ourselves, read the information and give them the juror questionnaires. I anticipate [defendant] would be present whatever date we're going to start this at. We do it the exact same way we [were] going to do it. . . . And we're all down there, then, with your client, and we do the questionnaires. [¶] MR. RAFAEL: Okay. So I understand the step of introduction is not going to take place [during the prequalifying of the jury], the questionnaires will not be distributed at that point? [¶] THE COURT: Right."

As promised, defendant and her counsel were present in the jury assembly room when the clerk swore the venire on July 21. The trial court introduced

16

defendant and all counsel, read the information, and explained the process of filling out the questionnaire.

### 3. *Forfeiture*

As noted, above, the People contend that defendant waived her right to raise preliminary jury screening procedural issues by failing to assert them in the trial court. We agree.

A defendant generally "is barred from raising on appeal defects in the preliminary jury screening procedure in which [she] acquiesced." (*People v. Ervin* (2000) 22 Cal.4th 48, 73.) "[I]mportant policies mandate that criminal convictions not be overturned on the basis of irregularities in jury selection to which the defendant did not object or in which he has acquiesced. [Citations.]" (*People v. Visciotti* (1992) 2 Cal.4th 1, 38.)

Here, defendant bases her claim that the jury pool screening procedural issues were not forfeited solely on Rafael's statement "informing the trial court of [defendant's] right to be present for the juror hardship screening." However, that claim is not supported by the record because, as discussed above, Rafael abandoned his statement objecting to the proposal when the court explained that defendant would be present before prospective jurors filled out their questionnaires, as they had agreed. Defendant argues that the "discussion then shifted" to a different "issue of whether the parties would be present later . . . before questionnaires were distributed." But the discussion never shifted; it always involved the trial court's explanation that it was honoring defendant's request to be present when the information would be read to prospective jurors.

17

Defendant did not object to the language in the summons notices[8] or to the composition of the venire or jury panel. She did not object when she learned the jury commissioner would time qualify prospective jurors. She also did not object when it became apparent that the prescreening would be used to eliminate persons who did not qualify to become prospective jurors under the exceptions to eligibility set forth in section 203.

Similarly, defendant did not object when she learned the trial court expected the jury commissioner to excuse potential jurors based on hardship grounds such as child care concerns or nonvital medical issues. Defendant did not even request to look at the detailed information regarding the hardship excuses the jury commissioner would consider despite the trial court's offer to share that information with the defense. Because defendant did not accept the trial court's offer to review the detailed information regarding the hardship excuses the jury commissioner would consider, she forfeited any claim that she was not informed the commission would prescreen prospective jurors for reasons other than those specified on the record.

Defendant did not object to, or question, the disparity between the number of summonses sent and the number of prospective jurors expected to appear and fill out questionnaires. She also did not object that additional venire members were added after the initial screening by the jury commissioner. Defendant did not object that prescreening violated her equal protection rights because it excluded a disproportionate number of Hispanics and treated those with language

---

[8]     The summons form in this case appears routine. (Code Civ. Proc., § 210.5 ["The Judicial Council shall adopt a standardized jury summons for use . . . ."].) To the extent defendant is claiming the form of the jury summons constituted constitutional error, she has forfeited that claim as well by failing to object on that ground in the trial court.

difficulty differently from those with sight or hearing impairments.  Defendant also did not object that the screening was vague, and thus violated due process, because there was no standard for determining language proficiency and because the standard applied, namely Code of Civil Procedure section 203, subdivision (a)(6), was unconstitutionally vague on its face and as applied.

Despite defendant's claim to the contrary, defendant did not ask to be present during the jury commissioner's prescreening.  She also did not make a motion to strike the jury venire or panel in the trial court.

Defendant never made a contemporaneous request for the jury commissioner to maintain records of the screening, and she never asked for the jury commissioner's conversations with the trial court or the preliminary screening to be recorded.

At the time of trial, subdivision (a)(1) of section 190.9 provided, in pertinent part, that "[i]n any case in which a death sentence may be imposed, all proceedings conducted in the municipal and superior courts, including all conferences and proceedings, whether in open court, in conference in the courtroom, or in chambers, shall be conducted on the record with a court reporter present."  (Stats. 1996, ch. 1086, § 4, p. 7657.)  Nothing in the record suggests that the trial court's conversations with the jury commissioner took place in the courtroom or in chambers, and, absent an objection to the trial court meeting informally with the jury commissioner, defendant has forfeited her claim that the lack of a record of its discussions with the jury commissioner deprived her of her constitutional rights to "due process and a jury trial as well as other statutory rights."

While subdivision (a) of section 207 of the Code of Civil Procedure provides that "[t]he jury commissioner shall maintain records regarding selection, qualification, and assignment of prospective jurors," that statutory language does

19

not support defendant's claim that "the time-qualification process by the commissioner should have been reported" by a court reporter. In *People v. Basuta* (2001) 94 Cal.App.4th 370, 396, the court held that "where there is a request, the trial court must require the jury commissioner to maintain a record of the hardship screening procedure." No such request was made here. The jury commissioner maintained some records, which are contained in five volumes of the clerk's transcript. Here, as in *People v. Mickey* (1991) 54 Cal.3d 612, 667, "defendant finds the state of the record unsatisfactory. But having made no relevant objection below, [she] may not be heard to complain in that regard." Defendant has forfeited her claim that the jury commissioner's failure to maintain a more complete record of regarding selection, qualification, and assignment of prospective jurors deprived her of her constitutional rights to due process and a jury trial. In any event, we will not overturn defendant's conviction on the basis of these alleged irregularities in the jury selection process "to which [she] did not object or in which [she] has acquiesced. [Citations.]" (*People v. Viscotti*, *supra*, 2 Cal.4th at p. 38.)

The jury commissioner was entitled to "inquire as to the qualifications of persons on the master list or source list who are or may be summoned for jury service." (Code Civ. Proc., § 196, subd. (a).) The jury commissioner had "authority to establish policies and procedures necessary to fulfill [the] responsibility" of "managing the jury system . . . in conformance with the purpose and scope of" the Trial Selection and Management Act set forth in Code of Civil Procedure section 190 et seq. (Code Civ. Proc., § 195, subd. (c).) The Trial Selection and Management Act includes Code of Civil Procedure section 203, regarding persons qualified to be trial jurors and exceptions to qualification. " 'Excused jurors' " are those prospective jurors who are excused from service by

the jury commissioner for valid reasons based on statute, state or local court rules, and policies." (Code Civ. Proc., § 194, subd. (d).)

Here, in light of the information defendant received during the multiple hearings covering the issuance of summonses and the proposed duties of the jury commissioner, defendant was made aware that the jury commissioner would be involved in ensuring that prospective jurors were time qualified to sit through a 10-week jury trial, were eligible for jury trial service within the meaning of Code of Civil Procedure section 203, and did not have a valid reason to be excused from jury service based on any hardship agreed upon by the trial court and jury commissioner. Nothing in the record supports defendant's claim that the jury commissioner exceeded her official function as described by the trial court in defendant's presence or her claim that procedures the jury commissioner followed during the preliminary jury screening were unanticipated by defendant or the trial court.

We conclude defendant has forfeited all four of the preliminary jury screening procedural issues she raises in this court by having failed to object on those grounds in the trial court.

### 4. Merit of Defendant's Jury Selection Issues

Defendant cannot prove the merit of her challenges to the preliminary jury screening procedure. On the present record, defendant cannot show that she was improperly denied a jury drawn from a representative cross-section of the community,[9] that the jury commissioner excused jurors for unauthorized

---

[9] Defendant asks this court to take judicial notice of census figures for the North Judicial District of San Diego County. The People object on the basis that this material was not presented to the trial court and should not be considered for the first time on appeal. We have rejected similar requests because the data was not presented in the trial court. (See, e.g., *People v. Ramos* (1997) 15 Cal.4th

*(Footnote continued on next page.)*

21

reasons,[10] that she was denied counsel or the right to be present during a critical stage of the proceedings, that she was denied the right to a public trial, or that the challenged language in the summons notices impermissibly altered the composition of the venire.

However, on the present record, we are able to address defendant's claim that the provision in Code of Civil Procedure section 203 that permits the excusal of prospective jurors with insufficient knowledge of the English language is "unconstitutionally vague" and violates both the "due process and equal protection

---

*(Footnote continued from previous page.)*

1133, 1155, fn. 2 (*Ramos*).) We additionally note that the summonses sent out in defendant's case did not request any ethnicity or race identification, and prospective jurors who responded to the summonses did not identify their ethnic or racial background on the questionnaires they filled out. Here, in light of our conclusion that defendant's representative cross-section claims are forfeited and, in any event, cannot be established on their merits, the census figures for the North Judicial District of San Diego County are irrelevant to our discussion. Thus, defendant's request that we take notice of those census figures is denied. (See, e.g., *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1141, fn. 6.)

[10] With regard to defendant's claim that some jurors were excused for hardship despite not having a note from their employers, the jury commissioner had discretion to grant hardship excuses based on financial burden (Cal. Rules of Court, former rule 860(b) and (d)(3), now rule 2.1008(b) and (d)(3).) Similarly, with regard to defendant's claim that some jurors were excused for lack of language proficiency, day care problems, medical concerns not tied to an appointment, and for prior jury service, the jury commissioner was authorized to screen out such prospective jurors. (Code Civ. Proc., § 203, subd. (a)(6); Cal. Rules of Court, former rule 860(d)(5), (d)(7), and (e) now rule 2.1008(d)(5), (d)(7) and (e.).) With regard to all these contentions, as well as defendant's claim that five jurors were excused for no reason, we presume that "official duty has been regularly performed" (Evid. Code, § 664), and that the jury commissioner properly determined that the excused prospective jurors fell within a category of ineligibility or hardship.

22

principles as guaranteed by the Fourteenth Amendment." We find this third challenge to the pretrial jury screening lacking in merit.

As discussed above, persons cannot serve as prospective jurors in California unless they "possess sufficient knowledge of the English language." (Code Civ. Proc., § 203, subd. (a)(6).) We conclude the challenged phrase is not unconstitutionally vague. Our state trials are conducted entirely in English, with translation into English provided only for those defendants and witnesses who do not speak English. There can be no doubt that, in context of deciding who is eligible and qualified to be a prospective juror within the meaning of Code of Civil Procedure section 203(a)(6), the phrase "possess sufficient knowledge of the English language" means sufficient knowledge of the English language to understand the legal proceedings and the evidence upon which a juror would base his or her decision in any given case. Defendant's speculative claim to the contrary, there is nothing in the record that suggests that individuals who received a jury summons in defendant's case improperly determined that they possessed insufficient knowledge of the English language to sit as a juror in a trial conducted in English.

We find meritless defendant's claim that section 203, subdivision (a)(6) of the Code of Civil Procedure violated her right to equal protection by excluding Hispanics from the jury selection process. Limiting jury service to those who "possess sufficient knowledge of the English language" (Code Civ. Proc., § 203, subd. (a)(6)) is a "permissible racially neutral selection criteri[on]" (*Alexander v. Louisiana* (1972) 405 U.S. 625, 632) that serves "a significant state interest" (*Duren v. Missouri* (1979) 439 U.S. 357, 367) in ensuring the uniform and efficient administration of the justice system and avoiding possible translation distortions. (See, e.g., *U.S. v. Benmuhar* (1st Cir. 1981) 658 F.2d 14, 18-20

23

[English proficiency requirement for jury qualification advances a significant state interest in a national language].)

For the same reason, we find meritless defendant's claim the challenged language requirement violates defendant's right to equal protection of the law because courts will provide "accommodations for the hearing [or sight] impaired" but not for "jurors who need assistance with English." The People correctly argue that the "requirement of knowing the English language is a neutral factor." (See, e.g., *Alexander v. Louisiana*, *supra*, 405 U.S. at pp. 631-632 [permissible racially neutral selection criterion does not violate equal protection guarantees].)

Defendant additionally claims that "publication to potential jurors of this vague standard reasonably explains the low Hispanic turnout because it provided an excuse for Hispanic people to ignore the summons." Defendant has presented no evidence to support this claim, and "[e]rrant speculation" of impropriety does not meet defendant's burden of proof on this issue. (*Ramos*, *supra*, 15 Cal.4th at p. 1157.)

In summary, we conclude defendant is not entitled to a reversal of the guilt or penalty verdict in her case based on her preliminary jury screening claims.

**B.  Constitutionality of the Searches of Defendant's Residence**

*1. Introduction*

Defendant contends evidence gathered from her home pursuant to two search warrants was illegally obtained during unreasonable searches in violation of the Fourth Amendment to the United States Constitution. Specifically, she claims the warrants were overbroad because they unnecessarily authorized a search for " 'dominion and control' evidence." In a concomitant argument, she claims the affiant for the warrants recklessly omitted material evidence, namely, that

24

Sheriff's deputies already knew defendant lived at the residence.   We conclude defendant's challenges lack merit.

### 2. *Background*

After deputy sheriffs found three dead bodies and two wounded individuals inside the home at 266 South Twin Oaks Valley Road in San Marcos (266 South Twin Oaks) on the night of the murders, they contacted homicide detectives.  In response, Detective Rawlins arrived at the scene and was briefed on the situation.  Then Rawlins, along with a deputy district attorney, telephoned a magistrate to request a warrant to search the residence immediately "for the possibility of collecting evidence and finding the perpetrator of the crime."  The magistrate issued a search warrant that authorized, in relevant part, a search for "documents and effects which tend to show possession, dominion and control over such premises, including . . . anything bearing a person's name, . . . or other form of identification . . . ."  During the search conducted pursuant to this warrant, Rawlins's team seized, as relevant here, handwritten notes found on the floor around the bed where defendant had shot herself, a pen, a Rolodex, a phone list, a telephone and answering machine, and miscellaneous papers.

Three days later, Detective Rawlins sought a second search warrant for the same residence to search for, among other items, weapons, ammunition, cartridge casings, bullets, telephone bills and records, medical records, medications and prescriptions, a computer and its hard drives, and additional items "tending to show dominion and control."  In support of this warrant, the detective stated that he had accounted for nine projectiles but only six empty casings, that he had received information that defendant was pregnant, and that, on the night of the murders, defendant had mentioned her fear that child protective services would come to interview her children.  In response, the magistrate issued a second search

warrant that authorized, in relevant part, a search for "ammunition, cartridge casings, bullets" and "items which tend to show possession, dominion and control, including handwritings, . . . photographs, . . . answering machines, audiotapes, pagers, or any means of identification bearing a person's name, number or photograph . . . ." During the search conducted under the second warrant, Rawlins and his team seized, as relevant here, photos and photo albums, videotapes, books, calendar, a notebook, prescription bottles, a word processor, and other papers.

Defendant filed a motion to quash and traverse both warrants and suppress the seized evidence on grounds that the language seeking evidence of dominion and control of the residence was overly broad, that the affidavits in support of the warrants failed to establish probable cause to seize dominion and control evidence because they omitted the material fact that members of the San Diego County Sheriff's Department already knew defendant lived on South Twin Oaks.

In denying defendant's motion, the trial court ruled information that members of the San Diego County Sheriff's Department had had prior contact with defendant and knew she lived in the house on South Twin Oaks was not material because the officers needed to investigate who else had access to the residence, if only to exclude them as suspects. It next determined there was no overbreadth in the language authorizing the searches for evidence of dominion and control because the officers needed to determine who had access to the residence at the time of the murders. The trial court also found that, even if the clauses seeking dominion and control evidence were overbroad and had to be redacted, the remaining proper portions of the warrants, such as the search for ammunition, would authorize a search of the entire residence. The trial court determined the magistrate properly authorized a full search of the residence, but that, if the warrants were declared defective, the officers acted in good faith in executing them.

26

We defer to the trial court's express and implied factual findings if supported by substantial evidence, but we independently determine the legality of the search under the Fourth Amendment. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1119.) Because courts accord a preference to searches and seizures conducted pursuant to a search warrant, "in a doubtful or marginal case a search under a warrant may be sustainable where without it would fall." (*U.S. v. Ventresca* (1965) 380 U.S. 102, 106.)

### 3. Overbreadth

Although defendant acknowledges the deputies' initial warrantless entry into her home "was appropriate under the 'imminent danger-to-person' exigent circumstance exception," she contends that the portion of the warrants authorizing the subsequent searches for, and seizure of, items related to "dominion and control" was "overly broad and non-particular so as to render that aspect of the warrant invalid." We disagree.

The warrant clause of the Fourth Amendment provides that no warrant may issue except those "particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.; see *Walter v. United States* (1980) 447 U.S. 649, 656-657, fn. 8; see also Cal. Const. art. I, § 13, § 1525.) Whether a warrant's description of property to be seized is sufficiently particular is a question of law subject to independent review by an appellate court. (*Thompson v. Superior Court* (1977) 70 Cal.App.3d 101, 108.) In considering whether a warrant is sufficiently particular, courts consider the purpose of the warrant, the nature of the items sought, and "the total circumstances surrounding the case." (*People v. Rogers* (1986) 187 Cal.App.3d 1001, 1008 (*Rogers*).) A warrant that permits a search broad in scope may be appropriate under some circumstances, and the warrant's language must be read in context and with

27

common sense.  (*Andresen v. Maryland* (1976) 427 U.S. 463, 480-481.)  For example, in *Andersen*, the warrant described documents related to a fraudulent real estate transaction and then added the phrase " 'together with other fruits, instrumentalities and evidence of crime at this [time] unknown.' "  (*Id*. at p. 479.)  The Supreme Court found the warrant, including this phrase, lawful because, in context, it was clear the phrase referred to the crime police were investigating and permitted officers to seize evidence of other real estate transactions made with false pretenses relevant to the defendant's methods and motives in the charged crime.  (*Id*. at pp. 480-481.)

In *Mincey v. Arizona* (1978) 437 U.S. 385, the Supreme Court noted that a search "of substantial scope" of a home in which there had been a recent murder could be constitutional after officers obtained a search warrant from a neutral magistrate.  The wide-ranging four-day search of the defendant's home in that case was held unconstitutional because the search was conducted without a warrant.  (*Id*. at p. 395.)

Here, in light of the information available to the affiant sheriff's detective at the time he sought the first warrant, he could not have realistically described the personal property sought to establish dominion and control with any more particularity.  (See, e.g., *U.S. v. Spilotro* (9th Cir. 1986) 800 F.2d 959, 964; *U.S. v. Cardwell* (9th Cir. 1982) 680 F.2d 75, 78.)  Officers knew that multiple murders recently had occurred inside the house, but they had little information as to how they were carried out or why.  While it appeared that defendant had committed the crimes, her responsibility had to be ascertained with more certainty, and any others who had access to the property or dominion and control of it needed to be considered or eliminated as suspects.

In *People v. Nicolaus* (1991) 54 Cal.3d 551 (*Nicolaus*), police obtained a search warrant to search the defendant's apartment for "letters, papers and bills

28

tending to show who occupied the apartment" (*id.* at p. 575), after they learned defendant's address from a dying woman who said defendant had shot her. During the search of the apartment, an officer opened a folder on the defendant's desk and found documents in the defendant's handwriting that described his plans to harm the victim and revealed his motives and state of mind before the murder. In finding the search into the folder for indicia of occupancy constitutional, we rejected defendant's contention that the search authorized by the above quoted phrase was not "sufficiently particularized." (*Ibid.*) We additionally noted that, "[i]n any event, the officers acted entirely properly in seeking independent evidence to establish defendant's occupancy of the apartment, and defendant's control over any evidence seized therefrom, for presentation in court." (*Ibid.*)

Here, as in *People v. Kraft* (2000) 23 Cal.4th 978, 1043 (*Kraft*), "the breadth of the warrant . . . was commensurate with the scope of the investigation." We therefore conclude the language in the challenged warrants that authorized a search for items that tended to show who had "dominion and control" was sufficiently particularized under the circumstances and was justified by the fact that multiple murders recently had been committed inside the residence in question. (*People v. Alcala* (1992) 4 Cal.4th 742, 799; *Rogers*, *supra*, 187 Cal.App.3d at pp. 1007-1009; *Nicolaus*, *supra*, 54 Cal.3d at pp. 574-575.)

### 4. *Seizure of Dominion and Control Evidence.*

Defendant next faults the investigating officers for reading and seizing the letters lying about her bed. She claims those letters were not relevant to dominion and control, that they were "merely [her] personal writings," and the officers had "no authorization to seize them under the guise of 'dominion and control.' " However, as officers searching defendant's residence for items tending to show dominion and control were entitled to search through trash cans and to look at any

29

paper items inside the home, they were also entitled to seize defendant's letters, though not listed in the warrant, because they were in plain view and their incriminating character was immediately apparent. (*Horton v. California* (1990) 496 U.S. 128, 136-137; *Kraft*, *supra*, 23 Cal.4th at p. 1043; *Nicolaus*, *supra*, 54 Cal.3d at p. 575.) Defendant's reliance on *Arizona v. Hicks* (1987) 480 U.S. 321, is misplaced. In that case, investigating officers engaged in conduct unrelated to the objectives of the authorized intrusion to search for a shooter and for weapons when they moved stereo equipment and obtained its serial numbers. (*Id*. at pp. 324-326.) Here, by contrast, the officers were engaged in an authorized search when they came upon the immediately apparent incriminating letters.

### 5. *Factual Omissions in the Search Warrants*

Defendant next contends the warrants should have been traversed because the affidavit for the first warrant omitted "relevant facts regarding the extensive prior contacts between the sheriff's department and [defendant], including the call to which Deputy Deese had responded earlier that day," and the affidavit for the second warrant additionally "omitted relevant information about the prior search conducted pursuant to the first warrant and the extensive history of prior contacts between [defendant] and the sheriff's department."

A defendant can challenge a search warrant by showing that the affiant deliberately or recklessly omitted material facts that negate probable cause when added to the affidavit. (*Franks v. Delaware* (1978) 438 U.S. 154, 171-172; *People v. Gibson* (2001) 90 Cal.App.4th 371, 381-382.) "A defendant who challenges a search warrant based upon an affidavit containing omissions bears the burden of showing that the omissions were material to the determination of probable cause. [Citation.] 'Pursuant to [California Constitution, article I,] section 28[, subdivision] (d), materiality is evaluated by the test of *Illinois v. Gates* (1983) 462

30

U.S. 213 . . . , which looks to the totality of the circumstances in determining whether a warrant affidavit establishes good cause for a search. [Citation.].' [Citation.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1297.)

The trial court concluded the omitted facts "would not have had any effect on the issuance of either warrant." We agree with the trial court that the omitted facts were not material because there is no "substantial possibility they would have altered a reasonable magistrate's probable cause determination," and their omission did not "make the affidavit[s] *substantially misleading*." (*People v. Kurland* (1980) 28 Cal.3d 376, 385.) As the trial court properly determined, even if the affidavits were tested by adding the omitted information, the magistrate still would have issued both warrants to search for items tending to show dominion and control, if only to rule out other suspects. Here, as in *People v. Bradford*, *supra*, 15 Cal.4th 1229, the magistrate "did not err in finding that, considered as amended to include the above described information, the affidavit[s] established probable cause." (*Id*. at p. 1299; see also *People v. Huston* (1989) 210 Cal.App.3d 192, 219-220.)[11]

We conclude the trial court properly denied defendant's motion to quash the two warrants and suppress the items located during the searches authorized by them.

---

[11]    We note that Detective Rawlins did not explain in his second affidavit why he needed additional items showing dominion and control or what items had been discovered during the first search that showed dominion and control, and that his affidavit in support of the second search warrant contained a misstatement, that he did "not contemplate making an arrest under the facts as they presently exist," although defendant already had been arrested and arraigned at the hospital. However, as the People point out, defendant "has not demonstrated any possible harm caused by any error in the second search warrant" because the only items she claims harmed her were her handwritten notes, which were seized during the first search.

31

**Admissibility of Rebuttal Expert Testimony**

Defendant contends the trial court erred by permitting the prosecution's expert to refute with "informal, undocumented and unpublished experiments" the conclusion of the defense expert that infusing fluids into the body affects subsequent blood analysis for the presence of drugs or alcohol.  Defendant claims her defense that she was unable "to form the mental state necessary" for first degree murder was improperly undermined by the admission of "incompetent testimony to minimize the evidence of intoxication."  Specifically, she contends that the personal observations of Dr. Vina Spiehler of the effects of intravenous transfusions on alcohol content while working at a coroner's office were based on material that failed to meet the reliability requirements of *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*),[12] Evidence Code section 801, subdivision (b), and the evidentiary " 'heightened reliability' requirement in capital cases imposed by the Eighth and Fourteenth Amendments" to the United States Constitution.  We conclude the trial court did not abuse its discretion by admitting the challenged rebuttal expert testimony.

*1.  Background*

The murders occurred between 7:12 and 7:34 p.m. on October 27, 1997. About 8:35 p.m. that evening, paramedics infused approximately three liters (3,000 cc's) of saline solution into defendant because of her loss of blood.  At 8:50

---

[12]     The *Kelly* rule alternatively is called the *Kelly/Frye* rule.  (*Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013; see e.g., *People v. McDonald* (1984) 37 Cal.3d 351, 372 (*McDonald*), overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896.)  We refer to it as *Kelly* in accord with our comment in *People v. Cowan* (2010) 50 Cal.4th 401, 469, footnote 22.

p.m., blood was drawn from defendant at the hospital. That blood was analyzed and found to contain both alcohol and drugs. The results of the analysis revealed a blood-alcohol content of 0.07 percent. The level of Prozac in defendant's blood was 118 nanograms of fluoxetine per milliliter of blood, and 258 nanograms per milliliter of its metabolite, norfluoxetine. The level of Valium in defendant's blood was 0.6 micrograms of diazepam, and 0.3 micrograms of its metabolite, nordiazepam.[13]

As noted in our factual summary, Dr. Clark Smith, who was board certified in addiction and forensic psychiatry, presented expert testimony on defendant's behalf. Dr. Smith reviewed Dr. Spiehler's toxicology report in which she had calculated an alcohol level of 0.09 for defendant at the time of the murders based on the average rate of alcohol burn-off for a woman per hour. Dr. Smith disagreed with that calculation. In his opinion, Dr. Spiehler failed to account for the diluting effect the infusion of fluids into defendant's body between the murders and the drawing of blood would have had on the level of drugs and alcohol in defendant's blood. In Dr. Smith's opinion, defendant's actual blood-alcohol content at the time of the murders would have been approximately 0.19 percent and the infused fluids also would have affected the level of Valium found in defendant's blood. Dr. Smith testified that, based on his calculations, the levels of alcohol and drugs in defendant's blood would have produced a "very significant effect" on the brain,

---

[13]    Under California law, the level of intoxication for driving under the influence is a blood-alcohol content of 0.08 percent. The therapeutic range for fluoxetine is 250 to 1,200 nanograms. The therapeutic range for nordiazepam is 0.1 to 1.5 micrograms, and the toxic range for diazepam is above 3.0 micrograms. Defendant had a therapeutic range of diazepam and nordiazepam in her blood. Valium had been in her blood for several hours as evidenced from the presence of its metabolite, but it could not be determined when she had taken the Valium.

33

including affecting emotions, perceptions, judgment, and other "higher brain functions."

In response to an objection to the admissibility of proposed rebuttal expert testimony on the issue of dilution, the trial court held an Evidence Code section 402 hearing regarding the proffered testimony. During that hearing, Dr. Spiehler, a pharmacologist board certified in forensic toxicology, testified that her calculations of defendant's drug and alcohol levels at the time of the murders and her opinions regarding the impact of dilution on blood-alcohol content were based on formulae from a pharmacology textbook and published literature, including the 1988 edition of Medical/Legal Aspects of Alcohol Determination and Biological Specimens (Garriott edit. 1988),[14] and Goodman and Gillman's Pharmacological Basis of Therapeutics (Goodman), and on her experience working in a coroner's office where she had examined before and after samples of blood-alcohol levels in 10 to 15 individuals who had received blood transfusions or intravenous fluids while being treated in the hospital. Dr. Spiehler said her observations led her to conclude there were no changes in blood-alcohol levels "that could be correlated to the transfusions in those cases."

At the end of the hearing, defendant objected to the proposed testimony on the basis that Dr. Spiehler's conclusions were mere observations "made in a casual setting and not subject to scrutiny of peer review or outside observers" rather than "scientific fact." The trial court determined that Dr. Spiehler was applying her practical work experience to the academic training she had received in a manner

---

[14] Spiehler explained during the hearing that the chapter on dilution in Garriott's 1988 edition upon which she had relied was removed from the later edition because Garriott could not locate the doctor who had written that chapter in the earlier edition. Defendant's presumption that that section of the book "had been discredited" is not supported by the record.

34

"no different than what almost any expert would . . . do on the witness stand in terms of taking his or her educational background, things that were learned in, for example, medical school and the practical application to his or her work experience. I see nothing improper about it now that I've heard her explain it, and it appears that it's just part of her training and experience working in the field."

Thereafter, Dr. Spiehler testified before the jury that she formulated her calculations "based on [defendant's] weight and how much water would be in her body where the alcohol goes—the alcohol follows the water—and calculated how much of an effect the dilutions would have from the fluids she was given, and [her] answer was different from Dr. Smith's." Dr. Spiehler explained that she disagreed with Dr. Smith's conclusion that the drugs in defendant's system were diluted by the saline infusion because the drugs defendant ingested "don't go into the watery parts of the body," but, instead, are stored in the fat. Dr. Spiehler calculated that the dilution would have lowered defendant's blood-alcohol content by as much as 10 percent, and concluded defendant therefore would have had a blood-alcohol level of approximately 0.07 at the time of the shootings.[15] She said her calculations were based on principles from Goodman's pharmacology textbook and her "conclusions and calculations of dilution after somebody gets intravenous fluids" were based on a chapter in Garriott. When the prosecutor asked if her "personal experience in the field confirmed what [she had] read in the literature," Dr. Spiehler replied, "Yes. I actually have looked at samples from people who had transfusions in the hospital, and I was able to look at samples

---

[15] On cross-examination, Dr. Spiehler conceded that a letter she wrote on May 28, 1999, stated that defendant's blood-alcohol level could have been 0.09. It is unclear from the record when she altered her position and concluded that defendant's blood-alcohol level was 0.07.

taken before they got the transfusion and afterward. And my experience has been sometimes the values go up, sometimes they go down, and sometimes they stay the same, the alcohol values." She added that she had not relied on the most recent edition of Garriott's textbook.

Dr. Smith testified on surrebuttal that Dr. Spiehler's testimony did not alter his opinion. He conceded that, if dilution did not occur based upon the infused saline in this case, Dr. Spiehler's calculations of defendant's blood-alcohol level at the time of the murders would be accurate, but he testified that his theory of dilution affecting blood-alcohol levels is correct and recognized in the scientific literature. Dr. Smith added that shock, including shock following a gunshot wound, could affect the absorption of drugs and alcohol into the blood. He suggested the effects of shock might apply here because defendant at one time had no measurable blood pressure or pulse.

### 2. Analysis

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) Evidence Code section 801 provides that, "[i]f a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier or fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education ) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his

36

testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

"The trial court's determination of whether a witness qualifies as an expert is a matter of discretion and will not be disturbed absent a showing of manifest abuse. [Citation.] ' "Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than to its admissibility." ' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 321-322; accord, *People v. Catlin* (2001) 26 Cal.4th 81, 139.)

Defendant first contends the trial court was required to apply the *Kelly* rule governing the admissibility of expert testimony based on new scientific techniques. Under *Kelly*, the admissibility of expert testimony based on "a new scientific technique" is "a two-step process: (1) the *reliability of the method* must be established, usually by expert testimony, and (2) the witness . . . must be properly *qualified* . . . . Additionally, the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case. [Citations.]" (*Kelly*, *supra*, 17 Cal. 3d at p. 30.) Defendant claims Dr. Spiehler founded her opinions on "highly questionable 'experiments,' " and that her testimony regarding them did not meet the *Kelly* requirements.

*Kelly* does not apply here. "[A]bsent some special feature which effectively blindsides the jury, expert opinion testimony is not subject to *Kelly*[]." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1157 (*Stoll*); see also *McDonald*, *supra*, 37 Cal.3d 351, 372.) No aspect of Dr. Spiehler's testimony or research involved a new scientific technique. She based her calculations of defendant's drug and alcohol levels at the time of the murders on principles from textbooks and literature in her field. She then testified that her observations while working at the coroner's office "confirmed" what she had read in the literature regarding the

37

effect, if any, of the intravenous fluids on alcohol levels in blood. We agree with the People that Dr. Spiehler "simply observed and relied upon comparative alcohol values in a series of cases where samples were available both before and after blood transfusions," and that her medical observations did not involve a new scientific technique.

*Kelly* was designed to insulate the jury from expert testimony premised on methods that "carry [a] misleading aura of scientific infallibility" (*Stoll*, *supra*, 49 Cal.3d at p. 1157), but no reasonable juror would have given unquestioned deference to Spiehler's medical opinion testimony regarding the analysis of alcohol and drug levels in the blood, a practice well known in science and the law. "We have never applied the *Kelly*[] rule to expert medical testimony, even when the witness is a psychiatrist and the subject matter is as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness, or even the diagnosis of an unusual form of mental illness not listed in the diagnostic manual of the American Psychiatric Association [citation]." (*McDonald*, *supra*, 37 Cal.3d at p. 373.)

Defendant's attempt to distinguish *Stoll* is unavailing. In *Stoll*, we held the trial court erred when it applied *Kelly* to exclude a psychologist's opinion testimony based on an interview and professional interpretation of standardized written personality tests. (*Stoll*, *supra*, 49 Cal.3d at p. 1163.) In part, we determined that *Kelly* did not apply because it was not based on a technique new to science or the law. (*Id.* at 1157.) We did distinguish the testimony of a "learned professional *art*" from the "science" triggering *Kelly* concerns (*id.* at 1159), explaining that admission of testimony based on new science presented dangers when "the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately

38

recognize and relay to the jury" (*id.* at p. 1156). The challenged medical observations made by Dr. Spiehler present no such danger.

Defendant's attempt to distinguish *People v. Bui* (2001) 86 Cal.App.4th 1187, fails as well. In *Bui*, the Court of Appeal declined to apply *Kelly* to expert testimony about methamphetamine blood levels and their correlation to driving ability because the expert's methodology was generally accepted in the scientific community. It reasoned that " '[t]he *Kelly* test is intended to forestall the jury's uncritical acceptance of scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate.' " (*Id.* at p. 1195, quoting *People v. Venegas* (1998) 18 Cal.4th 47, 80.) Dr. Spiehler's challenged testimony did not involve new scientific technology nor does it raise concerns under *Kelly*. Defendant mischaracterizes Dr. Spiehler's testimony as describing "experiments." Dr. Spiehler testified that she simply "looked at" samples taken from individuals before and after they had transfusions and compared the results of both samples.

Defendant next contends Dr. Spiehler's testimony was inadmissible under Evidence Code section 801, subdivision (b). In support of her contention that Dr. Spiehler's testimony lacked the required foundation, defendant relies on *People v. Willis* (2004) 115 Cal.App.4th 379, which detailed the foundational requirements for dog scent identification evidence, and *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, which involved property valuation testimony that failed to meet statutory requirements for property valuation. Those two cases did not address medical expert opinion testimony and do not directly support defendant's claim. In support of her claim that Dr. Spiehler's opinion was not based on material reasonably relied on by other experts in the field, defendant relies on *People v. Gardeley* (1996) 14 Cal.4th 605 and *Kelley v. Trunk* (1998) 66 Cal.App.4th 519. In *Gardeley*, we held the trial court did not err by allowing gang

39

expert testimony based on hearsay, personal investigations, and discussions among colleagues. We found the expert's opinion reliable, and recognized that, "[s]o long as [the] threshold requirement of reliability is satisfied, even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony. [Citations.]" (*Gardeley*, *supra*, 14 Cal.4th at p. 618.) Although *Gardeley* did not involve medical opinion testimony, its reasoning supports the conclusion that Dr. Spiehler's opinion testimony was reliable and admissible. Though *Kelley* involved medical opinion testimony, the expert there did not disclose what he relied on in forming his opinion under Evidence Code section 802. (*Kelley*, *supra*, 66 Cal.App.4th at pp. 523-524.) Here, by contrast, Dr. Spiehler disclosed the basis for her opinion, and her opinion was founded on information on which an expert may reasonably rely.

The fact that Dr. Spiehler did not rely on the latest edition of Garriott does not render her testimony inadmissible. Although a later edition omitted the article on which Spiehler relied, she testified it was omitted in the subsequent edition because the textbook's editor could not locate the article's author for approval. Defendant now objects that Spiehler's explanation for the omitted article is inadmissible hearsay, but she forfeited the objection by failing to raise it at trial. (*People v. Partida* (2005) 37 Cal.4th 428, 433-434; Evid. Code § 353.) In any case, the article itself did not provide a calculation; it merely provided suggestions to experts on how to talk to a jury. At the pretrial hearing, Dr. Spiehler testified the article "gives [an expert] a way of talking through [a difficult question in court] that a layperson might understand, rather than going into the scientific basis, which would be found in Goodman and Gillman."

Defendant next complains that Dr. Spiehler's explanation regarding the omitted article "defies common sense" because it is "unlikely that a well-known medical professional would suddenly disappear," and, "[e]ven if this were true,

and the medical data remained valid, why not simply publish it in the subsequent edition, rather than omit it?" Defendant was entitled to attack Dr. Spiehler's credibility regarding the claimed basis of her opinion, but questions regarding the validity or the credibility of an expert's knowledge go to the weight of such testimony, not its admissibility. (*People v. Bolin*, *supra*, 18 Cal.4th at p. 322.) Defendant did question Dr. Spiehler's conclusions and the foundation of her opinions through cross-examination, and additionally presented her own expert as a surrebuttal witness on the issue of dilution. We are convinced that Dr. Spiehler's testimony explaining the basis for her opinion was permissible under Evidence Code section 801, subdivision (a), and that her opinion testimony regarding the effect of dilution on alcohol and drug levels in blood was properly admitted under our state rules related to the admission of expert opinion testimony. (*People v. Catlin*, *supra*, 26 Cal.4th at pp. 138-139.)

Defendant next contends there is a heightened reliability requirement of expert testimony in capital cases under the Eight and Fourteenth Amendments. We disagree. In *People v. Prince* (2007) 40 Cal.4th 1179, 1229, faced with the same claim when a defendant objected to admission of an expert's testimony, we reiterated that "'[a]pplication of the ordinary rules of evidence generally does not impermissibly infringe upon a capital defendant's constitutional rights.'" (Quoting *People v. Kraft*, *supra*, 23 Cal.4th at p. 1035.) In any event, despite defendant's contention, she has not established that Dr. Spiehler's testimony was "so unreliable as to violate due process and the Eighth Amendment to the United States Constitution."

We conclude the trial court did not abuse its discretion by allowing Dr. Spiehler to provide the jury with her expert medical opinion testimony in rebuttal.

## IV. PENALTY PHASE ISSUES

### A. Admissibility of Defendant's Admission that She Mistreated Her Nephew

Defendant contends the trial court erred during the penalty phase by admitting evidence that she had smeared feces on the face of her nephew. Defendant claims admission of that testimony violated section 352 of the Evidence Code as well as her Fourteenth Amendment right to due process and her right to heightened reliability in a capital case under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 7 and 15 of the California Constitution. We conclude the evidence was properly admitted.

Before the evidence of the feces incident was admitted, defendant had introduced evidence to show that she was a good mother. That evidence presented defendant as someone who consistently acted lovingly and protectively towards her children by hugging and kissing them, keeping them well-groomed and well-fed, taking them to medical appointments, and exhibiting pride in them.

Linda Michele Smith, defendant's sister, later testified that she had been speaking with defendant on the telephone when defendant, whom Linda described as "an immaculate housekeeper," told her she had found a soiled "pull up" diaper that her nephew had stuffed between his bed and an adjacent wall. Defendant told her sister that she "got really mad," made him smell the soiled diaper, and then rubbed the feces in his face. After Smith "got angry" about how defendant had treated her nephew, defendant said she had not rubbed the feces in his face, that she had "just meant I made him smell it." Linda testified she did not believe defendant's partial retraction. During closing argument in the penalty phase, the prosecutor explained that the evidence that defendant had rubbed feces from her

42

nephew's soiled pull-up in his face was "offered to rebut the testimony that [defendant] was a good mother."

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) " 'The prejudice which Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors." (*People v. Zapien* (1993) 4 Cal.4th 929, 958; accord, *People v. Doolin* (2009) 45 Cal.4th 390, 439 (*Doolin*).) The potential for such prejudice is "decreased" when testimony describing the defendant's uncharged acts is "no stronger and no more inflammatory than the testimony concerning the charged offenses." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) We apply an abuse of discretion standard to review a trial court's ruling on the admissibility of evidence under section 352. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.)

Defendant's initial claim that her statements were inadmissible hearsay is meritless. The trial court concluded the statements fell under the hearsay exception for admissions of a party (Evid. Code, § 1220), and, implicit in its ruling was a finding that the statements were sufficiently reliable to be admitted in the penalty phase of defendant's trial. We are convinced that Smith's testimony provided substantial evidence to support the trial court's ruling, even under the

43

heightened reliability standard set forth in *Woodson v. North Carolina* (1976) 428 U.S. 280, 305.) We therefore next address defendant's section 352 claim.

The trial court had excluded evidence of the "feces" incident under Evidence Code section 352 during the guilt phase of defendant's trial on the basis that issue was "collateral" to the guilt of defendant for the deaths of her four children and was "redundant" on the issue as to whether defendant "disliked" her nephew. In that context, the trial court found the prejudicial effect of the potentially "disturbing testimony" that "a woman would spread feces on a child" more prejudicial than probative "given the People's theory."

However, at the penalty phase, once defendant raised the subject of her ability to parent, the trial court properly recognized that the prosecution was entitled to respond and introduce specific evidence of defendant's conduct that contradicted defendant's assertions. (*Ramos*, *supra*, 15 Cal.4th at p. 1173 ["In light of [a defense witness's] portrayal of defendant's religious recommitment, the prosecution could impeach her testimony with acts tending to contradict that impression."]; *People v. Gates* (1987) 43 Cal.3d 1168, 1211 ["If the defense chooses to raise the subject, it cannot expect immunity from cross-examination on it."].) Defendant's attempt to distinguish *Ramos* and *Gates* based on the fact that those cases involved cross-examination of a defense witness fails. Our focus is on the scope of admissibility of relevant rebuttal character evidence in response to either party's introduction of character testimony, and a "defendant has no right to mislead the jury through one-sided character testimony during either the guilt or penalty trial." (*People v. Siripongs* (1988) 45 Cal.3d 548, 578.)

"Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt." (*People v. Crew* (2003) 31 Cal.4th 822, 842.) Here, as the trial court recognized, although the

44

proffered evidence of the "feces" incident was potentially "disturbing," that evidence was highly probative as impeachment evidence regarding defendant's portrayal of "how the children were treated in the home." Defendant's claim to the contrary, the prosecution's proffered rebuttal character evidence was sufficiently "specific" and was related to a "particular . . . character trait defendant offer[ed] in [her] own behalf." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 792, fn. 24.) As explained above, " '[e]vidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant." (*Doolin*, *supra*, 45 Cal.4th at p. 438.) In *Doolin*, the court concluded the "challenged evidence was directly relevant to impeach defendant's own testimony and that of his witnesses. Although evidence of [defendant's rape of D.] and [his] mistreatment [of his girlfriend] is unpleasant, it paled in comparison to the testimony from four witnesses that defendant tried to kill them." (*Id*. at p. 439.) Similarly, here, where the charged offenses included four counts of first degree murder based on defendant having killed her four children, admission of evidence that defendant had mistreated her nephew once by rubbing his face in feces did not create "an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " (*People v. Waidla*, *supra*, 22 Cal.4th at p. 724.)

Considering all of the circumstances, we conclude the trial court did not abuse its discretion by admitting the evidence of defendant's uncharged misconduct, and that the admission of the challenged evidence did not violate due process or fail to meet the Eighth Amendment requirement of heightened reliability. (*Woodson v. North Carolina*, *supra*, 428 U.S. at p. 305.)

45

## B. Admission of Testimony of a Crime Scene Reconstructionist

Penal Code section 190.3, factor (a) permits the jury, in determining the penalty, to take into account the "circumstances of the crime[s] of which the defendant was convicted in the present proceeding." Crime scene reconstruction expert Rod Englert appeared at the penalty phase as the prosecution's first witness. Defendant contends his crime scene reconstruction testimony was inadmissible factor (a) evidence, "violated the heightened requirement of the Eighth Amendment to the United States Constitution, and was more prejudicial than probative within the meaning of Evidence Code section 352 and the due process clause of Fourteenth Amendment" to the United States Constitution. As we explain, defendant's claim has no merit.

Evidence depicting the "circumstances of the crime" generally is admissible at the penalty phase. (*People v. Loker* (2008) 44 Cal.4th 691, 755; *Ramos*, *supra*, 15 Cal.4th at p. 1164.) The trial court's discretion to exclude such evidence at the penalty phase is more circumscribed than it is in the guilt phase. (*People v. Box* (2000) 23 Cal.4th 1153, 1201.) Defendant concedes that, "[h]ad Englert's testimony been confined to bullet trajectories, etc., it may have been marginally relevant and therefore admissible." However, she complains that, in addition to such relevant testimony, Englert provided "unduly inflammatory" evidence by "editorializing about [defendant] pausing to reload the gun while the boys cowered in fear" and by making "speculative comments about the sequence of the shootings and the boys' state of mind."

After holding an extensive Evidence Code section 402 hearing on the admissibility of the challenged crime scene reconstruction evidence, the trial court determined the expert would provide "some helpful information" regarding the sequence of the shots fired, how the errant bullets "entered into the equation," and regarding the "other bullets that were fired in the bedroom of the three boys." The

46

court added that the expert would "shed some light on other areas that were not covered by the medical examiners' testimony and going directly to the circumstances of the crime, which is obviously relevant at the penalty phase." After expressly weighing the probative value of the proposed testimony against its potential for prejudice, the trial court found the evidence admissible. We find no abuse of discretion in the trial court's ruling.

Defendant's claim that Englert's testimony before the jury was unduly inflammatory is belied by the record. For example, defendant claims Englert testified that, while defendant reloaded her gun, Brigham and Matthew "cowered" on the lower bunk. However, while Englert used the word "cowering" out of the presence of the jury during the Evidence Code section 402 hearing regarding the admissibility of the proffered reconstruction evidence, he did not use that word during his actual testimony. Similarly, during his penalty phase testimony before the jury, Englert did not use the word "huddling," as defendant suggests. Instead, he testified that, based on the physical evidence of the crime scene, Brigham and Matthew were "very close together" when they were shot. Again, despite defendant's claim to the contrary, Englert did not testify before the jury that Matthew "scramble[d] to the other end of the bed"; Englert simply stated that, once Brigham had been shot but Matthew had not been hit, Matthew "move[d] to the opposite end of the bed" and "bent over."[16] Similarly, there was no testimony that Brandon was "slumped" over, as defendant claims. Instead, Englert testified Brandon was shot in the left temple, he "went down and onto the floor," and that

---

[16]     At the Evidence Code section 402 hearing, Englert did say that Austin appeared to have been "scrambling away from the shooter," and that Brigham and Matthew appeared to have been "scrambling and holding on to each other, for avoidance and retreat," but that testimony was not presented to the jury.

47

the "second shot was fired into the back of [his] neck." Similarly, the expert's testimony that Austin was in a defensive posture when shot was not unduly inflammatory or unduly "chilling," as defendant claims; Englert gave his straightforward expert opinion that Austin had pulled his knee up and "close to [his] head" in a defensive posture, "putting a barrier between himself and the shots that were being fired at him with the knee up" because "stippling could not get on his knee with his knee in a flat position."

Contrary to defendant's contention, the evidence provided by Englert was not based on speculation. Based on his extensive training and experience, as well as on an examination of the premises and a thorough review of the police and medical reports in this case, Englert presented testimony regarding bullet trajectories, stippling, and the relative positions of the multiple victims and the shooter that was "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801.) That evidence was relevant, probative, and not unduly prejudicial. (See e.g., *People v. Robinson* (2005) 37 Cal.4th 592, 643-644 [deputy medical examiner's penalty phase testimony regarding relative positions of the victims and the shooter was admissible].) Englert's testimony that defendant fired at the height of Austin's head three times, that one shot missed to the right of Austin, one missed to the left, and one struck him in the face, provided the jury with probative evidence regarding defendant's determination to shoot Austin in the head and provided the jury with one basis to consider whether the death penalty was appropriate in this case. Evidence that defendant reloaded her gun in the boys' bedroom was similarly probative on the issue of penalty.

Finally, nothing in the record of the expert's testimony supports defendant's claim that the reconstruction evidence did not meet "the heightened reliability requirement of the Eighth Amendment." At trial the defense left

unchallenged Englert's testimony that, based on the disciplines on which he relied and the facts of this case, his expert opinion "is within a reasonable degree of scientific certainty as what occurred in that residence and the sequence it occurred in." The testimony was presented in a dispassionately objective manner and did not create "an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " (*People v. Waidla*, *supra*, 22 Cal.4th at p. 724.) Accordingly, we find no violation of Eighth or Fourteenth Amendments to the United States Constitution.

We conclude the trial court did not abuse its discretion by admitting expert crime scene reconstruction testimony at the penalty phase to show the "circumstances of the crime" under factor (a) of section 190.3.

### C. Exclusion of Expert Testimony Concerning the Conditions of Confinement in Prison

Defendant offered the testimony of James Esten, a former employee of the Department of Corrections, to testify as an expert as to the conditions of confinement should defendant be sentenced to a term of life imprisonment without the possibility of parole. The defense proposed to introduce photographs taken at Valley State Prison for Women that depicted areas where defendant most likely would be housed if sentenced to life imprisonment without parole. The defense also proposed to have Esten testify regarding the "conditions of confinement." The trial court excluded the testimony as irrelevant. Defendant contends that ruling violated section 190.3 as well as her rights under the Eighth and Fourteenth Amendments to the federal Constitution.

"We have previously held that evidence of the conditions of confinement that a defendant will experience if sentenced to life imprisonment without parole is irrelevant to the jury's penalty determination because it does not relate to the defendant's character, culpability, or the circumstances of the offense. [Citations.]

49

Its admission is not required either by the federal Constitution or by Penal Code section 190.3. [Citations.]" (*People v. Quartermain* (1997) 16 Cal.4th 600, 632; see also *People v. Ervine* (2009) 47 Cal.4th 745, 794-795.) Based on our prior decisions, we conclude the trial court did not err by excluding the proffered testimony regarding the conditions of confinement that defendant would experience if sentenced to life imprisonment without parole.[17]

### D. Exclusion of Proffered Mitigating Hearsay Evidence and Admission of Hearsay Evidence in Aggravation

Defendant contends the trial court improperly excluded proffered mitigating evidence that she had been sexually molested by her cousin and father, as well as evidence that she helped a fellow inmate at the jail infirmary obtain needed medical attention. She contends that, "[i]n contrast, the [trial] court admitted evidence of an alleged incident at the jail where [she] supposedly became angry during an organized game" and made threats to a fellow inmate and a jail staff member. Defendant claims these rulings "lacked balance allowing inflammatory hearsay in aggravation and denying, as unreliable, important mitigating evidence."

We note that defendant contends that her penalty phase jury should not have been precluded from considering, as a mitigating factor, any aspect of her character that would permit the jury to return a sentence less than death. She relies on a capital case, *Green v. Georgia* (1979) 442 U.S. 95, to argue that this court

---

**17** On appeal defendant suggests that this court never has addressed the specific issue concerning evidence of "a day in the life" of a prisoner serving a life term without parole. We simply note that her case does not present such an issue. While arguing that it was entitled to present evidence of the conditions of confinement, the defense specifically informed the trial court that it did not intend "to go into . . . what a typical day is like" for prisoners sentenced to a term of life imprisonment without parole.

50

should dispense with traditional state rules of evidence when the death penalty is involved. In *Green*, although the statement was not otherwise admissible, the Supreme Court permitted the admission of a declaration against penal interest that the declarant shot the victim after ordering Green to leave because it was "highly relevant to a critical issue in the punishment phase of the trial" and "substantial reasons existed to assume its reliability." (*Id.* at p. 97.) We have repeatedly rejected the broad reading of *Green v. Georgia* that defendant urges. (See *People v. Weaver* (2001) 26 Cal.4th 876, 980-981.) Here, as in *Weaver*, we conclude the proffered mitigating evidence "bore no special indicia of reliability, so the rule [set forth in *Green v. Georgia*] did not require the trial court to dispense with the hearsay rule." (*Weaver*, at p. 981.)

Under our state rules of evidence, defendant had a right to present reliable mitigating evidence at her penalty trial. (*People v. Phillips* (2000) 22 Cal.4th 226, 238; see also *Green v. Georgia*, *supra*, 442 U.S. at pp. 96-97.)

With regard to defendant's attempt to introduce evidence that she was molested by her cousin Greg while she was a teenager, the trial court sustained an objection for lack of foundation after defense counsel asked Greg's father, Don, if an "inappropriate relationship" had developed between Greg and defendant while defendant was living with Don's ex-wife Rose. The objection was properly sustained because Don had testified moments earlier that he "wasn't involved," with defendant, Greg, or Rose at the time in question, he "didn't see them much" at that time, and he "didn't pay much attention" to what they were doing.

The trial court also excluded as unreliable hearsay the proffered statement by a career counselor that defendant had said she was molested by her father. The trial court reasoned that the statement was unreliable because defendant had confided in many people, including her psychiatrist and her psychologist, that she had been molested by "a number of other people, but not her father," and because

51

defense counsel conceded that defendant never had indicated that she had been molested by her father "to any of the mental health professionals" who interviewed her. In this instance, we agree with defendant that the fact she did not make the proffered statement to mental health professionals did not make the statement inadmissible. Nonetheless, we conclude any error in excluding the statement was harmless given the limited probative value of the proffered evidence.

With regard to the proffered medical assistance mitigating evidence, there was no eyewitness available to describe what happened during the incident in which a jail nurse assertedly did not respond to an inmate's request for medical assistance and defendant helped the inmate obtain the necessary medical attention. The proffered evidence was in an investigative report written by a doctor who was not present during the alleged incident. When defendant's attorney gave the trial court that report, he noted that he expected a hearsay objection from the prosecutor. The trial court excluded the proffered testimony because it did not fall within a recognized exception to the hearsay rule and was not sufficiently reliable to be admitted during defendant's penalty trial. Assuming arguendo that defense counsel could have laid a foundation that the proffered report fell within the official record exception to the hearsay rule (Evid. Code, § 1280),[18] we conclude any error in excluding the report was harmless as its probative value as mitigating evidence was not substantial.

[18] Evidence Code section 1280 provides that "[e]vidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

52

While "[e]xclusion of hearsay testimony at a penalty phase may violate a defendant's due process rights if the excluded testimony is highly relevant to an issue critical to punishment *and* substantial reasons exist to assume the evidence is reliable" (*People v. Phillips*, *supra*, 22 Cal.4th at p. 238), we conclude the excluded evidence in question, namely the proffered statement by a career counselor that defendant had said she was molested by her father and the investigative report regarding defendant helping an inmate obtain medical assistance, was not "highly relevant" (*ibid*).

We next conclude the trial court properly admitted evidence from defendant's jail records to impeach defense witness James Esten's expert opinion that defendant would not be a danger to others in the future if sentenced to prison. Esten had interviewed defendant and reviewed her jail records. After Esten characterized a fight in which defendant was involved at Las Colinas Detention Center in San Diego County as one in which she was confronted by another inmate and "retaliated appropriately in defending herself" by beating up that inmate, Esten was impeached by parts of the jail record that suggested it was defendant who confronted the other inmate, who spat at defendant in response. Esten also was impeached by parts of the jail record that described defendant as "vindictive," "full of loathing," and "antisocial," and parts of the jail record that indicated, while defendant was playing a game with another inmate, defendant said she might hit "the bitch" and then threatened to hit a staff member who was refereeing the game. Finally, Esten was impeached by the part of the jail record that indicated that defendant had threatened to kill Eric and the women who had accompanied Eric to the children's funeral if they came to her preliminary hearing. Esten testified that none of this impeachment evidence changed his opinion regarding defendant's "future dangerousness."

The prosecution is entitled to impeach a defense expert's testimony with acts that tend to contradict his opinion "[s]o long as the People ha[d] a good faith belief that the acts or conduct about which they wish to inquire actually took place." (*People v. Siripongs*, *supra*, 45 Cal.3d at p. 578; see also *Ramos*, *supra*, 15 Cal.4th at p. 1173.) Nothing in the records suggests otherwise. We conclude the trial court properly admitted the challenged evidence to impeach Esten's expert opinion testimony regarding defendant's future dangerousness.

Here, as in *Doolin*, *supra*, 45 Cal.4th at page 439, "[i]n the interest of complete review, we note that even if we were to assume evidentiary error, any error would be harmless, whether assessed under the federal constitutional (*Chapman* [*v. California* (1967)] 386 U.S. [18,] 24) or state (*People v. Watson* [(1956)] 46 Cal.2d [818,] 836) standard of review." We conclude there is no reasonable possibility that admission of the excluded proposed mitigating evidence and the exclusion of the admitted impeachment evidence in aggravation would have altered the jury's penalty verdict in light of the overwhelming evidence that defendant deliberately murdered her four innocent young children out of vengeance and hatred toward her most recent boyfriend and the father of two of her sons.

### E. Cumulative Error

Defendant claims the cumulative effect of the various errors that occurred during her trial requires reversal of her murder convictions and the death sentence, even if no error was individually prejudicial. Having found only minor harmless errors during defendant's trial, we reject her claim of cumulative effect.

### F. Instructional and Constitutional Challenges to California's Death Penalty Law

Defendant contends various features of California's death penalty statute and related standard jury instructions violate the Fifth, Sixth, Eighth, and

Fourteenth Amendments of the federal Constitution, parallel provisions of the state Constitution, and prevailing international law. We have rejected each of those challenges in the past. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 208-209; *People v. Schmeck* (2005) 37 Cal.4th 240, 303-304.) We reaffirm our prior holdings.

The statutory special circumstances that qualify a defendant for the death penalty (§ 190.2) are not unconstitutionally overbroad. (*People v. Verdugo* (2010) 50 Cal.4th 263, 304; *People v Harris* (2005) 37 Cal.4th 310, 365.) California homicide law and the special circumstances listed in section 190.2 adequately narrow the class of murderers eligible for the death penalty. (*People v. Gamache* (2010) 48 Cal.4th 347, 406; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1058.)

Factor (a) of section 190.3, which permits the jury to consider "the circumstances of the crime" in deciding whether to impose the death penalty, does not license the arbitrary and capricious imposition of the death penalty. (*People v. Brady* (2010) 50 Cal.4th 547, 589; *People v. Cook* (2007) 40 Cal.4th 1334, 1366; see also *Tuilaepa v. California* (1994) 512 U.S. 967, 974-980.)

The instruction that tells a jury to consider "whether or not" (§ 190.3) certain mitigating factors were present does not impermissibly invite the jury to aggravate on the basis of nonexistent or irrational aggravating factors. (*People v. Morrison* (2004) 34 Cal.4th 698, 730.)

The use in the sentencing factors of such restrictive adjectives as "extreme" and "substantial" in section 190.3, factors (d) and (g), does not act as an unconstitutional barrier to the consideration of relevant mitigation evidence. (*People v. Schmeck*, *supra*, 37 Cal.4th at p. 305.)

Neither unanimity nor proof beyond a reasonable doubt is constitutionally required for the jury's findings on the aggravating factors in this case. (*People v. Bolden* (2002) 29 Cal.4th 515, 566.) The reasonable doubt standard does not

apply to the jury's determination that death is the appropriate penalty, and the jury should not have been instructed as to the burden or standard of proof in selecting the penalty to be imposed. (*People v. Stanley* (2006) 39 Cal.4th 913, 964.) " 'Nothing in *Cunningham v. California* (2007) 549 U.S. 270, *Apprendi v. New Jersey* [(2000)] 530 U.S. 466, or *Ring v. Arizona* [(2002)] 536 U.S. 584, affects our conclusions in these regards.' " (*People v. Curl* (2009) 46 Cal.4th 339, 362; see also *People v. Thomas* (2011) 51 Cal.4th 449, 506.)

The federal Constitution does not impose on the prosecution a burden of proof as to penalty, and the state need not prove beyond a reasonable doubt whether "aggravating circumstances exist, that the aggravating circumstances outweigh the mitigating circumstances, or that death is the appropriate penalty." (*People v. Lewis* (2008) 43 Cal.4th 415, 533.) The federal Constitution does not require that the jury be unanimous as to which aggravating factors apply. (*People v. Davis* (2009) 46 Cal.4th 539, 628.) The instructions were not defective in failing to require that the jury provide express findings regarding the presence of aggravating factors. (*People v. Bunyard* (2009) 45 Cal.4th 836, 861.) Nothing in *Apprendi v. New Jersey*, *supra*, 530 U.S. 466, or its progeny, requires a different result. (*People v. Lewis*, *supra*, 43 Cal.4th at p. 534.)

Our state death penalty statute is not unconstitutional for failing to require intercase proportionality review or disparate sentence review. (*People v. Verdugo*, *supra*, 50 Cal.4th at p. 305; *People v. Cox* (2003) 30 Cal.4th 916, 970; see also *Pulley v. Harris* (1984) 465 U.S. 37, 50-51; *Roper v. Simmons* (2005) 543 U.S. 551, 560-561.)

Defendant's sentence does not violate international law. (*People v. Lewis*, *supra*, 43 Cal.4th at p. 539.)

Our death penalty law does not deprive capital defendants of equal protection by denying procedural safeguards to capital defendants that are afforded to noncapital defendants. (*People v. Hinton* (2006) 37 Cal.4th 839, 913.)

Finally, we reject defendant's claim that, when viewed as a whole, our sentencing scheme "fails to provide a meaningful or reliable basis for selecting the relatively few offenders subjected to capital punishment." Having concluded that none of defendant's challenges to our state's capital sentencing scheme have merit, we reject this general claim as well.

## V.  DISPOSITION

We affirm the judgment.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C.J.
KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Eubanks

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S082915
**Date Filed:** December 19, 2011

_____

**Court:** Superior
**County:** San Diego
**Judge:** Joan P. Weber


_____

**Counsel:**

Patrick Morgan Ford, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Adrianne S. Denault and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Patrick Morgan Ford
1901 First Avenue, Suite 400
San Diego, CA  92101
(619) 236-0679

Meagan J. Beale
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2225