Filed 6/27/23  P. v. Hurtado CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B320551 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA473878) |
| v. | |
| JONATHAN HURTADO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jason Tran and Kristen J. Inberg, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Early in the morning of December 20, 2018, a gunman in a two-door white Infiniti shot and killed Jerry Castro as Castro sat in his car. An amended information filed on December 5, 2019, charged defendant Jonathan Hurtado with Castro's murder (Pen. Code,[1] § 187, subd. (a)) and shooting at an occupied motor vehicle (§ 246). The information further alleged as to both counts that Hurtado and a principal personally and intentionally discharged a firearm causing death (§ 12022.53, subds. (b)-(e)(1)), that the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)), and that at the time of the offenses Hurtado was out of custody on bail (§ 12022.1).

Hurtado's first trial ended in a mistrial at his request due to the COVID-19 pandemic. A retrial by jury resulted in Hurtado's conviction on both counts. With regard to the enhancement allegations, Hurtado ultimately accepted the prosecution's offer to admit he personally used a firearm within the meaning of section 12022.5, subdivision (a) in lieu of a further retrial on the enhancement allegations. The trial court ultimately sentenced Hurtado to 35 years to life imprisonment.

On appeal, Hurtado argues the trial court erred when it denied his *Batson*/*Wheeler*[2] motion after the prosecution sought to excuse an African-American prospective juror. He further argues the trial court prejudicially erred in admitting photographs depicting Hurtado holding firearms, as well as evidence referring to Hurtado having a court date in an unrelated case that demonstrated Hurtado's connection to the white Infiniti

---

[1] All unspecified statutory references are to the Penal Code.

[2] *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69]; *People v. Wheeler* (1978) 22 Cal.3d 258.)

from which Castro was shot.  Finally, Hurtado requests that we review the sealed transcript of the trial court's *Pitchess*[3] in camera proceeding to determine whether the trial court followed the proper procedure for defense discovery of investigator personnel records.

Under the deferential standards of review applicable to these claims, we find no error and affirm.

## BACKGROUND

### A. Factual Summary

The facts introduced at the retrial resulting in conviction established the following.  On December 20, 2018, at about 12:20 a.m., Tommy A.[4] was driving along Long Beach Boulevard.  He saw a young person spray-painting and a stopped Chevrolet sedan ahead of his car.  Tommy expected the spray-painter to get into the Chevrolet when he finished painting because the car door was open.  Tommy was about to go around the Chevrolet when a white car, likely a Toyota or Infiniti, with paper plates and tinted windows passed Tommy's car on the left and stopped alongside the Chevrolet.  The painter ran.  After the painter began running, Tommy heard five gunshots and saw orange-colored gunshot sparks all coming from the same spot inside the white car.  He also saw a gun or hand (but not a whole arm) extended out of the passenger side window of the white car.  Although Tommy could not tell if the shooter was on the driver's or

---

[3] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

[4] As the trial court did, at least in part because several witnesses were minors, we refer to witnesses by their first name and last initial.  (See Cal. Rules of Court, rule 8.90(b).)

passenger's side, the shots "were all from the passenger's seat or the passenger's side or somebody reaching across the seat." Tommy could not tell how many people were in the white car. After the shots were fired, the white car sped away and the Chevrolet drifted to the corner. Tommy tried to follow the white car, but was unable to keep up with it. He called 911, returned to the scene, and spoke with police. A variety of surveillance cameras in the area captured these events and those videos were played for the jury. A defense expert who later analyzed the surveillance footage testified there were three or possibly four people in the white car.

City of Los Angeles Police Department (LAPD) officers were called to the scene at 41st Street and Long Beach Boulevard, arriving at 12:21 a.m. They found a sedan that had collided with a wall; in the driver's seat was an apparently-deceased male with a gunshot wound to the side of his head. They called for paramedics. An official with the Los Angeles City Fire Department declared Castro dead, with a traumatic brain injury from an apparent gunshot wound. A later autopsy confirmed Castro had died of multiple gunshot wounds. He had two fatal wounds to the head, one probably-fatal wound to the neck, and one wound to the chest. Officers did not find any shell casings at the scene of the shooting.

Prior testimony from Armando G. (who was unavailable as a witness) was read to the jury. Armando was 14 years old in December 2018, and referred to Castro as his cousin because they had known each other for a long time, even though they were not blood relatives. Armando said he was at home that night, not out tagging, and he did not see Castro injured by gunshots. Video was played of the incident; Armando denied it showed him

4

getting out of the Chevrolet after Castro was shot. A 911 call was also played, purportedly from Armando. The caller identified himself as being 14 years old, and he said his cousin had been shot near the corner of 41st Street and Long Beach Boulevard. The caller said the shooters left in a two-door white Infiniti. When the 911 call was played, Armando denied it was his voice on the call and denied he previously told detectives that he called an ambulance for Castro.

Hurtado was a member of the Ghetto Boyz gang. Castro's aunt testified Castro was probably a member of the 38th Street gang; a LAPD detective testified Castro had tattoos indicative of being a 38th Street gang member, including one saying "38" that covered the majority of his back. The Ghetto Boyz and 38th Street gangs are rivals. Castro's aunt told police that Armando had informed her Castro had been shot by a Ghetto Boyz gang member driving a white Infiniti; during the shooting, the front passenger had leaned back to allow the driver to shoot.

Later on the day of the shooting, LAPD Officer Jordan Medwin heard about the shooting and that a white two-door car had been identified as the suspect's vehicle. On December 16, 2018, Mynor G. had informed Officer Medwin that some Ghetto Boyz gang members in a white two-door Infiniti had pulled up next to Mynor on the street and flashed a gun.[5] As a result, Officer Medwin and his partner patrolled territory claimed by the Ghetto Boyz in search of a white two-door Infiniti.

---

[5] Mynor testified at trial that he did not know Officer Medwin, and denied that he talked to police officers about Ghetto Boyz gang members in a white Infiniti flashing a gun at him.

That patrol located a white Infiniti G37 with paper plates parked in front of a residence on East 32nd Street. Police stopped Hurtado on December 20, 2018, soon after he left the residence in the white Infiniti. While clearing the trunk after the traffic stop, an officer saw a shell casing and notified detectives. A later search of the car yielded six shell casings, with most in the rear seat or center console area, and a live bullet located by the front passenger-side door. All six expended shell casings were nine-millimeter Luger rounds fired from the same gun and exhibited characteristics consistent with that gun being a Glock pistol. Analysis of the three bullets recovered from Castro's body and car showed that they were consistent with nine-millimeter Luger, .357 Sig, or .357 Magnum ammunition.

The search of the Infiniti also recovered a court document related to Hurtado. The People showed the jury Hurtado's Snapchat story dated December 11, 2018, which contained a photo of the Infiniti's center console superimposed with the words "Fuck court date today." The court took judicial notice that Hurtado had a court date on December 11, 2018.

Investigators retrieved other photos from Hurtado's phone number and his Snapchat social media account; those pictures included Hurtado flashing gang signs and holding guns, including a Glock semi-automatic with an extended magazine. Logs for Hurtado's phone number from December 20, 2018, showed cell phone activity in the area of the shooting at 41st Street and Long Beach Boulevard at 12:23 and 12:24 a.m. on December 20, 2018.

Hurtado's mother had purchased a white Infiniti on or about December 7, 2018. In a police interview, Hurtado stated that only he, his mother, and his sister drove that car. Several

latent fingerprints matching Hurtado were found in the white Infiniti. An LAPD officer testified he had contact with Hurtado on December 9, 2018, at a car wash in Ghetto Boyz territory where Hurtado worked. At that time, Hurtado was driving a white two-door Infiniti with paper plates.

## B. Conviction and Sentencing

Trial was by jury. On March 16, 2020, while the jury was deliberating, the court declared a mistrial due to the COVID-19 pandemic. Retrial commenced on July 6, 2021. The jury found Hurtado guilty of first degree murder and shooting at an occupied motor vehicle. It found the firearm allegations not true as to Hurtado but true as to a principal. The jury also found the gang allegations true. There was no verdict on the on-bail allegation, as the court bifurcated it for later disposition.

Hurtado thereafter moved for a new trial based on changes to the law applicable to the gang and firearm allegations resulting from the passage of Assembly Bill No. 333 (2020-2021 Reg. Sess.). The court denied the motion as to the underlying convictions but granted it as to the gang and firearm allegations. The court sentenced Hurtado to 25 years to life on the first degree murder count and stayed the sentence on the shooting at an occupied motor vehicle count pursuant to section 654. On June 22, 2022, pursuant to a plea agreement, Hurtado admitted a section 12022.5, subdivision (a) allegation that he personally used a firearm in lieu of a further trial. The court sentenced Hurtado to an additional 10 years on the firearm enhancement for a total sentence of 35 years to life.

Hurtado filed a timely notice of appeal.

7

# DISCUSSION

## A. The Trial Court Did Not Err in Denying Hurtado's *Batson/Wheeler* Motion

### 1. *Background*

Prospective Juror No. 65 (Juror 65) was a male African-American who was single, lived in Los Angeles, had no children, worked as a vehicle appraiser, and had never served on a jury. He answered no to each of the trial court's preliminary questions that may have required further inquiry, such as whether he knew anyone convicted of a crime or anyone in law enforcement.

During voir dire, defense counsel asked the venire whether those who had previously served on a jury found the deliberations were "overall respectful" and civil even if jurors disagreed. Prospective Juror No. 90 responded in the affirmative. The following discussion then took place:

"[Defense counsel]: . . . [I will] give you one more hypothetical, an extreme case scenario. Say, it's 4:00 o'clock on a Friday, you've been deliberating. The vote is split 11 to 1. You're in the 11, and there's one person who just doesn't see the evidence the same way. Would anyone—does anyone feel they would be too concerned to pressure that one person to change their vote just to be done with the process? Prospective Juror No. 65, I saw you shaking your head 'no.' Sorry. We sometimes react—

"Prospective Juror No. 65: I wouldn't—

"[Defense counsel]: —to any—any reaction.

"Prospective Juror No. 65: No. Because, regardless of the time that it is, even on a Friday, I would still want that we cover every base, to make sure that everyone is agreeing on the right

out—like I say, the right outcome instead of, like, 'Oh, I just want to go home already.'

"[Defense counsel]:  Right.

"Prospective Juror No. 65:  Because it is—this is someone else's life that you're going to delegate from here, so I would think you would want to be as honest as possible and to make the right decision.

"[Defense counsel]:  That's perfect.  Does anyone—does anyone else feel differently . . . .  So let me give you just the flip side of that.  Say you're the one, the one person who does not see things the same as everyone else?  And, of course, I'm not asking you to not deliberate or just make your minds up right away.  I'm talking about after fully deliberating, fully reviewing all the evidence, if you are still in a different—have a different perspective from your fellow jurors, do any of you feel that you would change your vote, if you weren't convinced, just to be done with the process?"

The record does not reflect a response from Juror 65 to this last question.

Three days later, the prosecutor confirmed during voir dire Juror 65 was comfortable with the burden of proof and that he was "up to the task" to serve on the jury.  Then, using its eighth peremptory challenge, the prosecution sought to excuse Juror 65.  Defense counsel made a *Batson/Wheeler* challenge at sidebar.  The trial court and parties stated:

"[Defense counsel:]  He did not give anything—any answers that were problematic or showed anything that would go to cause and answered that he was up for being a juror, had no, essentially, negative or concerning answers in any other way.  So, basically, I would make the motion, based on him being African-

American and nothing—nothing that would show a basis, other than race.

"The Court: All right. Based on the fact you're just making it on that one individual, I am going to find a prima facie case. And I'll turn it over to the People, and you can present the court with your reasoning.

"[Prosecution]: Yes, your honor. My reasoning is, with respect to Juror No. 65, when he was—when counsel was questioning the panel about juror deliberations and talking about whether or not other jurors would be sharing their thoughts and would talk to each other, if there was an individual who was not seeing things the same way, he was nodding his head repeatedly, seeming to be affirming that it should not be a continued discussion, that the discussion would end there. I think that's contrary to how the jury should be deliberating in this case.

"The Court: So that's the reason for your—

"[Prosecution]: That is my reasoning.

"The Court: Any others?

"[Prosecution]: No.

"The Court: All right. And do you wish to be heard?

"[Defense counsel]: Your honor, I believe he nodded his head at a lot of points. Some people are more expressive. But there was nothing to support [the prosecution's] insinuation as to what that meant in that instance. And he did not follow up, and we did not question him as to that today, so I think that inference is far too speculative.

"The Court: At this point I'm going to find that the prosecutor has set forth a race-neutral reason for the exercise of the peremptory as to Juror No. 65, based on his own observations of the jurors and his inference from viewing the juror reacting in

10

certain ways to questions.  So at this point I'm going to deny your request for a *Batson-Wheeler* motion.  All right."

The trial court then thanked and excused Juror 65. Neither the record on appeal nor the parties' briefing indicates the race of any other prospective or seated jurors.

2.      *Legal Principals and Standard of Review*

" ' "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race." ' [Citation.]  ' "Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." ' [Citation.]  The law also recognizes ' "a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." [Citation.]  "A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges.  First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria.  Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge.  Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination.  [Citation.]  'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].' " ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 759-760.)

"[A]s a general matter, our review of a trial court's denial of a *Batson/Wheeler* motion is deferential, 'examining only whether substantial evidence supports its conclusions. [Citation.] "We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses." ' ([Citation]; see also [*People v.*] *Smith* [(2018)] 4 Cal.5th [1134,] 1147-1148 . . . [since ' " ' "evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' " ' [Citation.] . . . [I]n reviewing a trial court's reasoned determination that a prosecutor's reasons for striking a juror are sincere, we typically defer to the trial court" '].) [Citation.] [¶] Of course, restraint in this context does not mean abdication. [Citation.] ' " 'Although we generally "accord great deference to the trial court's ruling that a particular reason is genuine," we do so only when the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror.' " ' [Citation.]" (*People v. Smith* (2019) 32 Cal.App.5th 860, 870, italics omitted.)

3.    *Analysis*

Hurtado argues "the prosecutor's claimed reason for excusing this juror has no support in the record and in fact is directly contradicted by the colloquy with Juror 65 on this subject." In our view, the colloquy was ambiguous. Defense counsel's question, "[D]oes anyone feel they would be too concerned to pressure that one person to change their vote just to be done with the process," was somewhat opaque. One could

interpret it as asking whether someone would feel comfortable pressuring someone to change their vote, or as asking whether someone would feel uncomfortable pressuring someone to change their vote. Thus, one could fairly interpret, as the prosecutor did, Juror 65's repeated shaking of the head when defense counsel questioned how to approach a situation where there was a juror who saw things differently than the majority of other jurors as indicating Juror 65 would not seek to convince that holdout juror to change their view. Or one could interpret Juror 65's response, as Hurtado does now, to reflect that Juror 65 thought continued deliberations were important to make sure all jurors agreed on the right outcome and that there was no basis for concern about how Juror 65 would approach a situation with a holdout juror.

Reflecting this ambiguity, defense counsel did not correct what Hurtado now claims was a misstatement about the colloquy with Juror 65 when making the *Batson*/*Wheeler* motion. Defense counsel agreed with the prosecutor's statement that Juror 65 repeatedly nodded his head. Defense counsel's argument in response to the prosecutor's proffered reason for excusing Juror 65 was instead that Juror 65 was an expressive individual, and the prosecutor's inference of what the head nodding meant was too speculative.

" 'A prospective juror may be excused based upon bare looks and gestures . . . .' [Citations.]" (*People v. Fiu* (2008) 165 Cal.App.4th 360, 398-399.) " ' "[R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor . . . , making the trial court's first-hand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said

13

to have exhibited the basis for the strike attributed to the juror by the prosecutor.  We have recognized that these determinations of credibility and demeanor lie ' "peculiarly within a trial judge's province," ' [citations], and we have stated that 'in the absence of exceptional circumstances, we would defer to [the trial court].' [Citation.]" ' [Citation.]" (*People v. Jones* (2011) 51 Cal.4th 346, 361.)

There is no dispute Juror 65 shook his head repeatedly— defense counsel noted it before questioning Juror 65, and again during the *Batson/Wheeler* motion by admitting Juror 65 "nodded his head at a lot of points."  Given that one could subjectively read Juror 65's undisputed gestures to raise a concern with his approach to jury deliberations, the trial court did not err in finding the prosecutor set forth a credible, race-neutral reason for the preemptory challenge to Juror 65.  The inquiry is not objective but subjective—"whether the advocate exercising the challenge had an honest and racially neutral reason for doing so." (*People v. Hensley* (2014) 59 Cal.4th 788, 803, italics omitted.)  As substantial evidence supports the trial court's conclusion that the prosecution's challenge to Juror 65 was not made on the basis of group bias alone, the court did not err in denying Hurtado's *Batson/Wheeler* motion regarding that prospective juror.

## B.    The Court Did Not Abuse its Discretion When Making Evidentiary Rulings

We turn next to Hurtado's claim that the court erroneously admitted certain photographs of firearms and evidence of his court date in another matter.

### 1.    *The Applicable Law*

Evidence Code section 352 permits the exclusion of evidence, among other things, if "[t]he court in its discretion . . .

14

[determines that] its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Ibid*.) " 'Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.] ' "The prejudice which . . . Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' [Citations.] The potential for such prejudice is 'decreased' when testimony describing the defendant's uncharged acts is 'no stronger and no more inflammatory than the testimony concerning the charged offenses.' [Citation.]" (*People v. Eubanks* (2011) 53 Cal.4th 110, 144.)

"We apply an abuse of discretion standard to review a trial court's ruling on the admissibility of evidence under [Evidence Code] section 352." (*People v. Eubanks*, *supra*, 53 Cal.4th at pp. 144-145.) Even if the trial court abuses its discretion when admitting evidence, we will not reverse a conviction unless there is a reasonable probability that the defendant would have achieved a more favorable outcome had the evidence been excluded. (*People v. Young* (2019) 7 Cal.5th 905, 931; *People v. Watson* (1956) 46 Cal.2d 818, 836-837.)[6]

_____

**6** We reject Hurtado's argument that the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.E.2d 705] applies here, as the evidence at issue does not implicate issues of fundamental unfairness.

15

### 2. *Photographs of Firearms*

The weapon used to murder Castro was never recovered. The People sought to admit photos of Hurtado obtained from his social media accounts and cell phone showing him brandishing pistols that were consistent with the suspected murder weapon. Specifically, the People sought to introduce a photo of a nine-millimeter Glock pistol with an extended magazine lying across the center console of Hurtado's car, additional photos of the same Glock pistol, a photo of Hurtado posing in the driver's seat of a car with a nine-millimeter pistol on his lap, and a still from a video showing a semiautomatic firearm in the center console of Hurtado's car.

Hurtado argues the trial court abused its discretion in admitting these photographs because there was insufficient evidence connecting the depicted firearms to the murder weapon. We disagree. Six nine-millimeter casings were found in Hurtado's car; all were likely fired from a Glock pistol. The three bullets found at the crime scene were also consistent with nine-millimeter ammunition. All of the challenged photographs except one showed a Glock pistol; those photographs thus showed the potential murder weapon and were probative of guilt. As for the remaining photograph, the court found it relevant because although the displayed gun was not a Glock, it was still a nine-millimeter weapon (and thus the same potential caliber as the

---

(E.g., *People v. Powell* (2018) 5 Cal.5th 921, 951-952 ["When evidence is erroneously admitted, we do not reverse a conviction unless it is reasonably probable that a result more favorable to the defendant would have occurred absent the error"], citing *People v. Watson, supra*, 46 Cal.2d at p. 836; *People v. Partida* (2005) 37 Cal.4th 428, 439 [same].)

16

murder weapon), and the picture was taken close in time to the murder. The court further noted the picture showed Hurtado displaying gang signs with the nine-millimeter weapon tucked into his waistband, and the photograph was therefore relevant to intent and motive given that the victim was from a rival gang.

We perceive no abuse of discretion in the court's admission of these photographs. Ballistics testing indicated the murder weapon was consistent with a nine-millimeter pistol, and likely, but not conclusively, a Glock. Although the evidence did not establish any of the guns in the photographs were necessarily the murder weapon, any of them might have been—the requisite degree of connection between each of the firearms and the murder weapon was shown. Furthermore, the photograph of the non-Glock pistol was relevant not only because it might have been the murder weapon, but also to Hurtado's motive and intent to shoot a rival gang member that was otherwise a stranger to him as it showed him displaying gang signs with the nine-millimeter weapon tucked into his waistband. The evidence " 'was thus relevant and admissible as circumstantial evidence that [Hurtado] committed the charged offenses.' [Citations.]" (*People v. Homick* (2012) 55 Ca.4th 816, 876.)

3.   *Evidence Referring to Court Date*

The trial court admitted evidence that an unspecified court document related to Hurtado was found in the Infiniti, and that Hurtado's Snapchat story for December 11, 2018, contained an image of the Infiniti's center console with the words "Fuck court date today" superimposed across it. Hurtado argues this evidence was highly prejudicial and had no probative value, and the trial court therefore erred in admitting it. We disagree.

17

Before admitting this evidence, the court asked outside the presence of the jury whether Hurtado was conceding sole use of the Infiniti. Hurtado, as was his right, refused any such concession. The judicial paperwork found in the car (a bail receipt) was not admitted; the court prohibited any reference to the document being a bail receipt and limited the prosecution to eliciting whether the search found "paperwork relating to a court date in connection with [Hurtado]." That court paperwork relating to Hurtado was found in the car (along with shell casings and a bullet) helped to establish Hurtado's dominion and control over the Infiniti. Evidence that Hurtado had a court date, without any other detail, was not unduly prejudicial given the probative nature of the testimony.

As for the Snapchat story image, the court took judicial notice that Hurtado had a court date on December 11, 2018, in another matter. The Snapchat image, along with its message about a court date, showed Hurtado's connection to the Infiniti near in time to Castro's murder. The posting of the image to Snapchat, a mobile phone application, was also probative of Hurtado's connection to the mobile phone number identified as his—a mobile phone that was in the area of the murder at the time it happened. Nor was the evidence unduly prejudicial. The photograph was not graphic and did not disclose anything about the nature of the other case. While the Snapchat image expressed Hurtado's upset with having a court date, it did not indicate what if anything he intended to do about that upset, what that case involved, or anything else prejudicial. It therefore did not pose an intolerable risk to the fairness of the proceedings or the reliability of the outcome given its probative value. (*People v. Eubanks*, *supra*, 53 Cal.4th at p. 146.)

**C.    We Find No Error in the Trial Court's *Pitchess* Motion Ruling**

Hurtado requests we make an independent review of the trial court's ruling on his *Pitchess* motion with regard to two LAPD officers, Medwin and Esteban Aguilar, who were involved in the murder investigation.  The Attorney General does not object.

A criminal defendant is entitled to the discovery of confidential police officer personnel records if the information contained therein is relevant to defend against the charge. (*Pitchess*, *supra*, 11 Cal.3d at pp. 537-538.)  To obtain such records, the defendant must show good cause; he must "establish . . . a logical link between [a proposed defense] and the pending charge" and "articulate how the discovery being sought would support such a defense or how it would impeach the officer's version of events."  (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1021; see Evid. Code, § 1043, subd. (b)(3).)  Discoverable information "is limited to instances of officer misconduct related to the misconduct asserted by the defendant."  (*Warrick*, *supra*, at p. 1021.)

Under *People v. Mooc* (2001) 26 Cal.4th 1216, 1229 to 1232, upon a defendant's request, we may review the sealed transcript of a trial court's in camera *Pitchess* hearing to determine whether the trial court disclosed all relevant documents.[7]  We have done

---

[7] The police officers' personnel records are not part of the record on appeal.  We have only the sealed transcript of the trial court's in camera review.  When the confidential personnel records themselves are unavailable, the appellate court may conduct an adequate review by considering only the sealed

so. The proceedings were stenographically recorded; a custodian of records was present and placed under oath, indicating she had brought all responsive documents with her. The custodian identified and presented for review matters for the relevant officers, which the trial court reviewed. The custodian also provided the court with the police officers' personnel records, which it reviewed. The court concluded there was no discoverable information because there was nothing demonstrating either officer's lack of credibility. The trial court properly complied with the required *Pitchess* procedures.[8]

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

---

transcript. (*People v. Myles* (2012) 53 Cal.4th 1181, 1209; *People v. Mooc*, *supra*, 26 Cal.4th at p. 1229.)

[8] Hurtado also argues that the trial court's errors cumulatively prejudiced him. Because we find no error in the first instance, there is nothing to cumulate.

20