Filed 3/12/26  P. v. Cena CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D087170 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF2201001) |
| SALVADOR CENA, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Riverside County, Jason Armand, Judge.  Affirmed.

Wallin & Klarich and Jonathan M. Lynn for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

Salvador Cena appeals following his conviction of sexual penetration of a person under the age of 14 (Pen. Code,[1] § 289, subd. (j)) and committing a lewd and lascivious act upon a child under the age of 14 (§ 288, subd. (a)).  Cena contends his convictions must be reversed because the trial court

---

[1]    Undesignated statutory references are to the Penal Code.

committed prejudicial error in admitting expert testimony regarding Child Sexual Abuse Accommodation Syndrome (CSAAS). We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*A. Charged Sexual Abuse Crimes*

One evening in June 1999, M.A. attended a family gathering at her great aunt I.C.'s house in Corona, California. I.C. is Cena's mother, making Cena M.A.'s first cousin once removed, but M.A. thought of him as her uncle, and their families were very close. M.A., who was 12 years old at the time, fell asleep on the living room couch while watching television with Y.A., another young family member, and Cena's younger brother. All three were asleep in different parts of the living room. Cena, who was 24 years old then, was also living at the house with his parents and some of his siblings.

M.A., who was 37 years old at the time of trial, testified that she awoke that night to find Cena tugging her underwear down and touching her vagina under her dress. He began by rubbing the outside and then penetrated her vagina with his fingers. Feeling scared and confused, M.A. opened her eyes and saw Cena sitting on the couch next to her feet, watching television while inserting his fingers inside her vagina. M.A. pretended to wake up and start stretching, hoping Cena would stop. When he saw her moving, Cena got up and left the room. M.A. estimated that he touched her for about two minutes.

Once Cena left, M.A. got up and woke Y.A. to tell her what happened. M.A. recalled crying and feeling "very scared." M.A. and Y.A. immediately called M.A.'s mother, R.A., and asked her to pick them up from the house because Cena had touched M.A. M.A. and Y.A. then attempted to wake up Cena's sister in her room, but they had trouble waking her up. M.A. and Y.A. went back to the living room, hid behind the recliner, and talked about screaming if Cena came back and tried "to do something." R.A. and M.A.'s

2

grandmother, M.R., eventually came to the house and took M.A. home. When they first arrived, M.A. was crying and told them that Cena had touched her, but she "just wanted to leave" and did not want to discuss the details. M.A. recalled thinking, "I told my mom; I told my grandma. They'll take care of it." No one reported the incident to law enforcement.

M.A.'s mother continued to bring her to family gatherings at I.C.'s house where Cena was living, and M.A. felt she did not have a say in whether she "was going to go or not." Although no one discouraged M.A. from reporting the abuse, she said she was raised to not be disrespectful or question family members, so when nothing happened after the incident, she recalled feeling like "everything . . . went away" without anyone "giving [her] an explanation," and that after she told her mother and grandmother, "that was it."

In November 2021, 22 years later, M.A. reported the incident to the police. M.A. testified she did not realize how much the incident affected her until after she got married and was triggered by being touched in certain ways. M.A. said that she eventually told her teenage son about the incident to explain why she did not let him and his brother go to sleepovers. He encouraged her to report the incident, so she decided to come forward and call the police.

During cross-examination of M.A., defense counsel asked about some details of the incident that M.A. could not recall, like how many people were at the gathering, how long she was at I.C.'s house, when Cena arrived there, whether M.A. ate after arriving, and how many times she woke up after falling asleep. The defense also asked M.A. if she tried to stop Cena when he was touching her or whether she ever tried to discuss what happened with him, to which M.A. responded in the negative.

3

M.A.'s mother, R.A., testified that when M.A. was younger, they used to go to I.C.'s house at least twice a month. R.A. remembered receiving a call from her daughter the night of the incident. M.A. was crying and asked R.A. to come pick her up because Cena had touched her. R.A. called her own mother, M.R., and they drove to I.C.'s house together. M.A. came running to them when they arrived, crying and asking to leave. At that point M.R. talked to I.C. outside of the house for a few minutes, but R.A. could not hear what they were saying. Afterwards, M.R. told R.A. "not to do anything and that [I.C.] would talk to her husband," Cena's father. R.A. understood that to mean that I.C. was asking them not to report the incident. M.R. also told R.A. that she believed it was not rape "because he had not used his penis[,]" so R.A. did not think the incident was reportable. R.A. testified that although she continued to take M.A. to I.C.'s house for gatherings afterwards, she did not see Cena there often.

Y.A. testified that she is three years older than M.A., and although Y.A. is technically M.A.'s aunt, they grew up together like sisters. On the night of the incident, she did not remember watching television in the living room or falling asleep there. She recalled that she was in another room when M.A. woke her up crying and saying that Cena had touched her. M.A. called her mother over the phone and told her what happened. Then they both waited for M.R. and R.A. to come pick them up. Y.A. recalled that when they arrived, both M.R. and R.A. spoke to I.C. about the incident. Y.A. described M.A.'s demeanor as "scared," and she had never seen M.A. like that before. After that night, Y.A. and M.A. never talked about what happened again, and Y.A. did not see M.A. around Cena after the incident because M.A. "always wanted to stay away."

4

M.A.'s oldest son testified at trial about how M.A. was "overprotective" about letting him and his younger brother go to sleepovers. When M.A. told him about the incident, "her tone was sad" and "she was teary." He encouraged her to report the incident because it "was really wrong."

*B. The People's Expert CSAAS Testimony*

Monica Borunda, a child forensic interviewer, professor, and licensed marriage and family therapist specializing in treatment for sexual abuse, testified as the People's expert on CSAAS. She did not interview anyone connected with the case, had not read any police reports, and did not know the identity of the victim or any witnesses. She also affirmed that the purpose of her testimony was not to say whether Cena was guilty, or whether any of the victim's allegations were true. Borunda proceeded to define CSAAS as "a group of contexts and behaviors or a lack of behaviors that we see when children have been sexually abused." She explained that rather than being a diagnostic tool, CSAAS is intended to be a means for understanding behaviors. But just because someone exhibits those behaviors does not necessarily mean they were sexually abused.

Borunda stated that there are five components of CSAAS: secrecy, helplessness, entrapment and accommodation, delayed disclosure, and retraction. Secrecy refers to the fact that child sexual abuse happens in secret and "oftentimes someone who is sexually abusing a child will speak to the consequences if they tell someone." At times, the child does not "have to be threatened or told not to tell someone. Sometimes they just know that if [they] make this person unhappy or upset this person, something bad is going to happen." When asked about a scenario in which a child has told someone in the family about the abuse, Borunda explained that other adults may

advise against disclosure because the perpetrator is often a relative, and reporting the incident to authorities would "disrupt the family."

Helplessness refers to the idea that a child who is being sexually abused may not have the resources or independence to respond in the way an adult would.  For example, an adult might report the incident right away and "fight or push or scream."  But children are "inherently vulnerable" because they depend on adults "for survival or basics like food and shelter but also emotionally[.]"  Helplessness also comes into play when children "go along with what parents say" and "believe what their parents tell them."

As for entrapment and accommodation, Borunda said that this concept relates to "different types of strategies that children use" to cope with sexual abuse.  Sometimes children decide they are "not going to think about [it,]" or they may take steps like locking their bedroom door, wearing "really tight-fitting pajamas to go to bed," dissociating, or avoiding their abuser.

Delayed disclosure relates to the fact that "[m]ost children who have been sexually abused do not disclose immediately."  According to Borunda, "about two-thirds of them don't disclose during childhood at all" and the "average age of disclosure of child sexual abuse is 52."  Reasons for delayed disclosure include that children may not "know what is happening to them" or are afraid of the consequences of reporting the abuse.  Children who are abused by someone close to them are also less likely to disclose right away.  Maternal support is "the number one determining factor" in a child's willingness to disclose, but if a child feels their mother "is not going to support them or believe them or do something about it," then the child will not report the abuse.

Borunda explained that a child abuse victim's disclosure may be "piecemeal" in that they may give an account of what happened, and then

6

"a week later they might remember other parts of the story[.]" She called this the "reminiscence effect." A child may also disclose part of what happened to "see how someone responds" before giving more detail or "shut[ting] down." As time passes, victims' memories may have gaps or become less clear. Someone experiencing sexual abuse may also focus on certain details over others.

The prosecutor posed the following hypothetical to Borunda: "[L]et's say someone is abused in the early teens, age 12, and they do piecemeal disclosure. Nothing done of it. Remains quiet for most of her adult life 'til about 34 years old. At that age, what might be a reason for disclosure given the length of time that's passed?" The defense objected on speculation grounds, and the trial court overruled the objection. Borunda answered that the disclosure could occur for many reasons, including the victim being motivated by seeing the vulnerability of their own children, finding out their abuser has abused someone else, or having trouble in their own intimate relationships.

On cross examination, Borunda affirmed that she was not testifying "against or in favor of either side," that her position was "impartial and neutral," and that she could only testify in general terms because she had not read anything about the case. Defense counsel focused her questions on Borunda's testimony about how a child who delays disclosure might not have clear memories of the incident because of how much time has passed and because of how fearful the child was at the time. Borunda explained that while some peripheral details might be less clear, like the color of the wall in the room, the "core details will usually be plain and clear at [] certain points," unless even those details are gone completely because the child dissociated. On redirect, Borunda stated that the identity of the abuser "would be a core

7

detail," while "small details" like the color of the abuser's shirt might be less memorable.  Borunda also said that a child might have more difficulty "clearly remember[ing] a stranger" than someone they are familiar with.

### C. Defense Evidence

The defense called I.C., Cena's mother.  She said that the night of the incident, M.A. and Y.A. slept over at her house but "did not wake up there" because of a situation involving R.A. not having "enough space for them" in her car.  I.C. said she called her sister, M.R., the next day, and M.R. told her she had picked up M.A. from her house because M.A. was scared when Cena woke her up "for her to go to the room."  I.C. said M.A. was angry when Cena woke her up because "they didn't take her the night before at nighttime," presumably referring to R.A.  When asked whether M.R. confronted I.C. about Cena's alleged inappropriate touching, I.C. said M.R. only told her that when Cena woke M.A., she got scared and ran to "the room."  She said M.R. told her, "thank God nothing had happened."  I.C. denied knowing that anything inappropriate happened between M.A. and Cena, and she denied ever telling M.R. not to go to the police.

On cross-examination, I.C. said she did not know who picked up M.A. from her house that night.  She denied speaking with M.R. the night of the incident, denied telling M.R. that she would talk to Cena about the touching, and denied ever telling M.R. not to call the police.  But shortly after those denials, I.C. said that she did tell M.R. she would reprimand Cena, and when I.C. asked Cena the next day about what happened, he said he was just trying to wake M.A. up.  When asked about statements she made to a defense investigator denying any knowledge of abuse allegations before Cena's arrest, I.C. responded, "Well, whatever happened, how it happened, that he woke her up or he touched her, . . . the whole family continued being the same because

8

my parents lived here in Riverside.  So that subject was never talked about it [*sic*] again."

*D. Rebuttal Evidence*

M.A. took the stand again as a rebuttal witness for the People after the defense rested.  She testified that there was no issue with space in her mother's car, and the reason she slept over at I.C.'s house was because she wanted to spend time with Y.A.  M.A. said she did not believe Cena was trying to wake her up that night, and that he neither spoke to her nor looked at her while he was touching her.

The People also called M.R., M.A.'s grandmother, as a witness.  M.R. recalled waking up to a phone call from her daughter R.A. the night of the incident.  R.A. sounded nervous and wanted M.R. to accompany her to I.C.'s house.  When they arrived, M.A. and Y.A. came to them crying, telling them that Cena had touched M.A.  M.R. asked them whether I.C. and her husband knew what happened, and they said "no."  M.R. went inside yelling for I.C. until both she and her husband came to the living room to meet her.  At some point I.C.'s husband went looking for Cena, but could not find him, so he went back to his room.  According to M.R., I.C. told her not to tell anyone about the incident because I.C. and her husband "were going to scold [Cena]" and "give him a good punishment."  M.R. denied ever telling I.C. that M.A. was upset about having to sleep over at her house or that M.A. had said Cena was just trying to wake her up that night.  But M.R. kept the incident to herself because it seemed like M.A. did not want to talk about it, and because I.C. asked her "not to say anything."

*E. Trial Court Proceedings*

The People charged Cena with sexual penetration upon a person under the age of 14 years old and more than 10 years younger than defendant

9

(§ 289, subd. (j), count 1) and committing a lewd and lascivious act upon a child under the age of 14 (§ 288, subd. (a), count 2). The People also alleged as aggravating factors that M.A. was a particularly vulnerable victim (Cal. Rules of Court, rule 4.421(a)(3)) and that Cena took advantage of a position of trust and confidence to commit the crime (*id.*, rule 4.421(a)(11)). Cena requested bifurcation of the aggravating factors and waived his right to a jury trial on those factors.

At a pre-trial hearing, the court heard argument on the People's motion in limine to admit testimony from their expert, Monica Borunda, on CSAAS. The defense argued that Borunda should be excluded because she lacked personal knowledge of the incident and could only testify "in a general setting, general nature[.]" The court overruled the objection, ruling that Borunda could testify about CSAAS and address "some of the general myths surrounding [CSAAS] and the methodology surrounding it," but could not address "the specific facts of this case" or "why the jury should or should not believe [M.A.]." The prosecution confirmed that Borunda had no knowledge about the facts of this particular case.

The trial court instructed the jury, among other things, that Borunda's testimony about CSAAS was "not evidence that the defendant committed any of the crimes charged against him" and that jurors could "consider this evidence only in deciding whether or not [M.A.'s] conduct was consistent with the conduct of someone who has been molested and in evaluating the believability of her testimony." (CALCRIM No. 1193.)[2]

After deliberating for about 2.5 hours, the jury found Cena guilty of sexual penetration (§ 289, subd. (j), count 1) and committing a lewd and lascivious act (§ 288, subd. (a), count 2). The trial court found the charged

---

2     Cena does not challenge this jury instruction on appeal.

aggravating factors to be true, and further found Cena's past performance on probation was unsatisfactory. The court sentenced Cena to a mid-term of six years in state prison for count 1 and stayed punishment for count 2. (See § 654.)

## DISCUSSION

Cena argues on appeal that the trial court improperly admitted Borunda's testimony about CSAAS because the evidence presented no "myths" to debunk and because Borunda exceeded the allowable scope of CSAAS testimony. Cena also argues that CSAAS testimony is no longer probative as a general matter because the information is now "common knowledge," and potential jurors are not susceptible to the commonly held "myths" that CSAAS was originally intended to address. Lastly, he claims the admission of CSAAS evidence violated his due process rights. We address each argument in turn.

*A. Governing law*

Although CSAAS evidence is inadmissible to prove that a molestation occurred, "it has long been held that in a judicial proceeding presenting the question whether a child has been sexually molested, CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse." (*In re S.C.* (2006) 138 Cal.App.4th 396, 418.) For example, when a victim's credibility is placed at issue due to "paradoxical behavior, including a delay in reporting," CSAAS testimony is admissible to explain to the jury how such behaviors are not inconsistent with molestation. (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 (*Patino*); see also *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 (*McAlpin*) [acknowledging that the " 'great majority of courts' " approve of admitting expert CSAAS testimony "to disabuse jurors

11

of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior."].)

It is the People's burden to "identify the myth or misconception the evidence is designed to rebut." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394 (*Bowker*).) But "[i]dentifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." (*Patino, supra*, 26 Cal.App.4th at pp. 1744–1745.) Admitting CSAAS evidence "is not error merely because it was introduced as part of the prosecution's case-in-chief rather than in rebuttal," and "the prosecution should be permitted to introduce properly limited credibility evidence if the issue of a specific misconception is suggested by the evidence." (*Id.* at p. 1745.)

*B. Analysis*

Cena contends there were no "myths" presented by the evidence that CSAAS testimony was needed to address. He also argues that Borunda went beyond the proper scope of CSAAS testimony when she addressed a child victim's potential memory issues, provided insight on how a victim's cultural context impacts delayed disclosure, and responded to a hypothetical with facts matching the case.

Cena has forfeited these challenges by failing to object below. In pre-trial proceedings, defense counsel only objected to Borunda's potential testimony on the grounds that she "does not have any personal knowledge of the incident" and could only testify in a "general nature" about CSAAS. Cena does not argue on appeal that the trial court erred in overruling that

12

particular objection, and the defense raised no other objection to Borunda's testimony pre-trial. Then during her testimony, defense counsel only objected twice. In the first instance, the prosecutor posed a hypothetical regarding a victim who was abused at the age of 12 but then delayed disclosure until she was 34, matching M.A.'s circumstances. But defense counsel objected to the prosecutor's question as speculative, not as beyond the scope of proposed expert testimony. In the second instance, the prosecutor asked Borunda whether a child's memory of abuse would be more readily retained if the abuser was a known person as opposed to a stranger. Defense counsel objected to the question's initial formulation on "improper hypothetical" grounds, but after the court overruled the objection, the prosecutor rephrased the question and defense counsel did not renew her objection.

The failure to raise a timely and specific objection forfeits a claim on appeal. (Evid. Code, § 353, subd. (a); *People v. Geier* (2007) 41 Cal.4th 555, 609–610; *People v. Eubanks* (2011) 53 Cal.4th 110, 142.) Here, Cena's trial counsel made no mention during any of these short exchanges between the court and the parties, either pre-trial or during trial, of "myths" or "misconceptions" being inapplicable in this case. Nor did Cena's counsel object when Borunda gave testimony on the "reminiscence effect," core and peripheral memory, cultural context, or any other topic he now contends are "not a part of CSAAS." Accordingly, he has forfeited his contentions.

Even if he had properly preserved his arguments, however, and even assuming the trial court erred in admitting Borunda's testimony, it is not reasonably probable that Cena would have obtained a more favorable verdict had the testimony been excluded. Evidence outside of the CSAAS testimony supported the jury's finding that Cena molested M.A. The fact that M.A.

13

immediately told her mother and Y.A. about the abuse lends credibility to M.A.'s account. Testimony from her mother and Y.A. also largely corroborated M.A.'s testimony, and I.C. contradicted her own denials about what happened that night. Multiple witnesses testified that M.A. was demonstrably upset both soon after the incident and when recounting it decades later. Moreover, there was no substantive evidence to support a theory that there was an alternative perpetrator, or that M.A. was somehow mistaken about what happened. Even putting aside Borunda's testimony, M.A. gave a plausible explanation for her decision to report the abuse to law enforcement decades later. M.A.'s explanation was also corroborated by her son and unrefuted by any other evidence. Furthermore, Borunda made clear she was not offering any opinion on Cena's guilt and the court instructed the jury that her testimony was "not evidence that the defendant committed any of the crimes charged against him." (CALCRIM No. 1193.) We therefore conclude it is unlikely that Borunda's testimony was a significant factor in establishing Cena's guilt. (See *People v. Watson* (1956) 46 Cal.2d 818, 836; *Bowker, supra*, 203 Cal.App.3d at p. 395.)

We also decline to adopt Cena's suggestion that we do away with the use of CSAAS testimony altogether because it is "unreliable," and concepts addressed by CSAAS are now "common knowledge." The Court of Appeal in *People v. Munch* (2020) 52 Cal.App.5th 464 (*Munch*), relying on the Supreme Court's opinion in *McAlpin, supra*, 53 Cal.3d at pp. 1300–1301, addressed arguments like those that Cena raises now, and rejected them. The *Munch* court reaffirmed that *McAlpin* remains valid and binding with respect to the admissibility of CSAAS evidence. (*Munch*, at p. 468, citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [decisions of Supreme Court are binding on other state courts of California].) Moreover, as the

14

*Munch* court explained, in the years following the Supreme Court's opinion in *McAlpin* in 1991, CSAAS evidence has continued to be admitted by courts in this state. (*Munch*, at p. 468.)

Cena, like the defendant in *Munch*, relies on several out-of-state cases to argue that CSAAS evidence has been rejected as unnecessary to disabuse jurors of misconceptions about the conduct of abused children. But as the *Munch* court explained, the fact "[t]hat other jurisdictions may disagree with [*McAlpin*] does not change [*McAlpin*'s] impact on California cases." (*Munch, supra*, 52 Cal.App.5th at p. 468.) The *Munch* court also explained why the out-of-state authorities relied on by the defendant in that case for the proposition that other jurisdictions no longer admit CSAAS evidence because of its purported deficiencies were not persuasive on their merits. (*Id.* at p. 469.) We agree with the *Munch* court's analysis of those cases, as well as its reasons for concluding that CSAAS evidence need not be subjected to the *Kelly* test.[3]

Finally, we reject Cena's contention that the admission of Borunda's testimony violated his due process rights. His argument rests on his assertion that CSAAS evidence is unreliable and "falls prey to syllogistic fallacy." Because we have rejected this contention and concluded that the trial court did not err in admitting CSAAS testimony in this case, we further conclude that the admission of this evidence did not violate Cena's constitutional fair trial or due process rights. (See *People v. Cage* (2015) 62 Cal.4th 256, 284 ["because the trial court did not abuse its discretion in

---

[3]    See *People v. Kelly* (1976) 17 Cal.3d 24 and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013. Although the rule was "[f]ormerly known as the Kelly-Frye rule, . . . the rule is now the *Kelly* rule in California after changes to the Federal Rules of Evidence that superseded *Frye*." (*People v. Nieves* (2021) 11 Cal.5th 404, 442, fn. 8.)

admitting [the challenged evidence], there was no violation of defendant's constitutional rights" arising from the admission of the evidence].) Accordingly, we affirm the judgment.

DISPOSITION

The judgment is affirmed.

BUCHANAN, Acting P. J.

WE CONCUR:

CASTILLO, J.

RUBIN, J.